**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MICHAEL AMATO, | : | |
| JOY MONSANTO, | : | |
| 50's LOUNGE, LLC, | : | DKT No.: 3:20-cv-00464-MPS |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| MAYOR JUSTIN ELICKER, | : | |
| MAYOR'S REPRESENTATIVE, | : | |
| GOVERNOR NED LAMONT | : | |
| | : | |
| Defendants. | : | April 10, 2020 |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR TEMPORARY**
**RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

The Plaintiffs respectfully request the Court to issue a temporary restraining order pursuant to Federal Rule of Civil Procedure 65(b) until the Court can fully hear their request for a preliminary injunction and a final determination as to the constitutionality of the Defendants'[1] various orders indefinitely shuttering the Plaintiffs' business and restricting the number of people who may gather regardless of whether they follow prescribed social distancing practices.

The Defendants have forcibly stripped, at the threat of punishment and wholly by executive fiat, the citizens of the state of Connecticut including the Plaintiffs of many of their civil liberties – the right to freely assemble, the right to freely associate with other people, and the right to pursue an honest living. Contrary to the Defendants' assumptions, these rights, guaranteed by both the federal and state constitutions, do not cease to exist at the first sign of a public emergency. They endure as unmistakable and counter-

---

[1] For purposes of this motion, "Defendants" refers only to Governor Ned Lamont and Mayor Justin Elicker.

majoritarian statements of where the people have determined that the public interest truly lies: the preservation of liberty. Neither the federal nor the state constitution contain any provision that states that the various executives, or the legislature, may redefine the public interest to completely suspend constitutional rights in the name of a crisis.

The Plaintiffs recognize that the state of Connecticut and our entire nation is facing a grave public health emergency due to the ongoing coronavirus pandemic. As a testament to their understanding, the Plaintiffs *voluntarily* closed their business on March 15, 2020 to assist in the efforts to curb the spread of coronavirus. *See* Compl. ¶¶ 13-14. The Plaintiffs further recognize that the Defendants have both the authorization and the moral and ethical obligation to exercise the state's police power to take *reasonable* steps to protect the public. However, the state's police power does not authorize the Defendants' suspension of constitutional liberties. Rather, the proper exercise of the state's police power requires that the measures taken by its authorization be both necessary and carefully tailored to the purported need.

The Defendants' vague orders are not necessary nor are they carefully tailored to address the purported public health need. They have seized power for themselves to arbitrarily determine whether the rights to freely assemble, freely associate with other people, and pursue an honest living are essential. Mayor Elicker's actions demonstrate the very dangerousness that our constitutions seek to prevent: the targeting of a perceived political adversary through the enforcement of unconstitutional orders. *Id.* at ¶¶ 13-18. Our constitutions protect the Plaintiffs from the Defendants' attempts at petty tyranny even when they seek to use a public emergency as a fig leaf to hide their actions.

The Plaintiffs will suffer irreparable harm by the Defendants' orders if the Court does not stay the Defendants' orders. They will lose their business, and they will never regain the lost time and opportunities that they would gladly spend with assembling and associating with members of their community. These factors merit the grant of a temporary restraining order and a preliminary injunction.

<u>**Argument**</u>

A temporary restraining order is admittedly an extraordinary remedy. *Moore v. Consol. Edison Co. of N.Y., Inc. v. Reidy*, 409 F.3d 506, 510 (2d Cir. 2005). "The purpose of a temporary restraining order is to preserve an existing situation in status quo until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction." *Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97, 107 (2d Cir. 2009). The same factors used to determine the merits of a preliminary injunction are used to determine a request for a temporary restraining order. *Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.*, 965 F.2d 1224 (2d Cir. 1992). Consequently, to obtain their requested temporary restraining order, the Plaintiffs must show "irreparable harm, and either (1) a likelihood of success on the merits of the case or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in favor of the moving party." *Waldman Pub. Corp. v. Landall, Inc.*, 43 F.3d 775, 779-80 (2d Cir. 1994).

I.   **THE PLAINTIFFS WILL SUFFER IRREPARABLE HARM IF THE COURT DOES NOT GRANT THEIR REQUEST FOR A TEMPORARY RESTRAINING ORDER.**

To show irreparable harm, the Plaintiffs must show that, absent a temporary restraining order, they will "suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial

to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Id.* at 118-19. Courts will presume that a movant has established irreparable harm in the absence of injunctive relief when the movant's claim involves the alleged deprivation of a constitutional right. *American Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015).

The Plaintiffs in the instant matter are entitled to the presumption of irreparable harm in the absence of injunctive relief because they have alleged that they have been wholly deprived of their constitutional rights to pursue an honest living, freely assemble, and freely associate.

The Plaintiffs also show actual and imminent harm that is irreparable as to Governor Lamont's order concerning their business. Governor Lamont's order commanding them to shut down their physical operations is placing an unsustainable financial burden on them. *See* **Exhibit A - Sworn Affidavit of Joy Monsanto, ¶¶ 6, 9-10; Exhibit B - Sworn Affidavit of Michael Amato, ¶¶ 6, 9-10**. The financial burden is that they will incur business expenses in the form of overhead while being denied any and all opportunities to bring in revenue. **Monsanto Affidavit, ¶ 9; Amato Affidavit, ¶ 9.** If the order continues in effect, the Plaintiffs will incur substantial financial loss, and, given the indefinite nature of the order in the sense that it can be repeatedly extended as long as the Governor feels like extending it, the Plaintiffs will be forced to discharge valuable employees because they will not be afford to pay them. **Monsanto Affidavit, ¶ 10; Amato Affidavit, ¶ 10.** Furthermore, the Plaintiffs will face the ultimate loss of their business and

4

their business assets through Governor Lamont's denial of any opportunity to generate revenue. **Monsanto Affidavit, ¶ 10; Amato Affidavit, ¶ 10**. The permanent loss of their business and their business assets will be an irreparable loss to the Plaintiffs that the law cannot remedy.

The Plaintiffs also show actual and imminent harm that is irreparable as to the Defendants' orders banning any gatherings of people that exceed a certain number of people. The orders make it practically impossible for the Plaintiffs to assemble and associate with their family, friends, customers, and other likeminded individuals. **Monsanto Affidavit, ¶¶ 7-8; Amato Affidavit, ¶¶ 7-8.** The Plaintiffs will never regain these opportunities to associate with their family, friends, customers, and other likeminded individuals in these moments of crisis when the community's strength should be leveraged. They will suffer long-term personal and financial consequences that the law's remedy cannot cure.

## II.    THE PLAINTIFFS SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR CLAIMS.

### A.  THE RIGHT TO PURSUE AN HONEST LIVING.

The right to pursue an honest living predates the Magna Carta as the Magna Carta itself recognizes: "[a]ll merchants are to be safe and secure in leaving and entering England, and in staying and traveling [sic] in England… to buy and sell free from all maletotes by the ancient and rightful customs…." J.C. Holt, *Magna Carta* 461-63 (2d ed.

1992).[2] So deeply did this right become established in English common law that the King's Bench in 1602 declared

> [T]his condition is against law, to prohibit or restrain any to use a lawful trade at any time… for as well as he may restrain him for one time… he may restrain him for longer times… being freemen, it is free for them to exercise their trade in any place… [A party] ought not to be abridged of his trade and living.

*Colgate v. Bacheler*, 78 Eng. Rep. 1097 (K.B. 1602).

Lord Coke stated the reasoning for these absolute statements of the English common law right to pursue an honest living in his seminal work on monopolies[3]: "a man's trade is accounted his life, because it maintaineth his life…." Edward Coke, The Third Part of the Institutes of the Laws of England, at *181 (William S. Hein Co. 1986) (1797).

The Founding Fathers carried their ancestors' antipathy to the Constitutional Convention – a sentiment best summed up by George Mason's declaration that "[h]e was afraid of monopolies of every sort…." James Madison, *Notes of Debates in the Federal Convention* 638 (Adrienne Koch ed., 1966). In that spirit, the Founding Fathers took care not to give the federal government the power to prevent citizens from pursuing an honest living.

In the seminal case of *Corfield v. Coryell*, Justice Bushrod Washington described certain "privileges and immunities which are, in their nature, fundamental, which belong,

---

[2] The English tradition of individual rights further developed after the Magna Carta through the common law as King Edward I acknowledged in the Confirmatio Cartarum. Confirmatio Cartarum (Nov. 5, 1297).

[3] The monopolies that Lord Coke and William Blackstone confronted were conceptually different from our modern conception of monopolies. Blackstone defined a monopoly as "a license or privilege allowed by the king for the sole buying and selling, making, working, or using of any thing whatsoever; whereby the subject in general is restrain from that liberty of manufacturing or trading which he had before." 4 William Blackstone, Commentaries, at *159.

of right, to the citizens of all free governments…." 6 F. Cas. 546 (C.C.E.D. PA. 1823). These rights included "the enjoyment of life and liberty… the right to acquire and possess property… and to pursue and obtain happiness and safety; subject nevertheless to such restraints as the government may justly prescribe for the general good of the whole…." *Id.*

Picking up on *Coryell*, numerous state courts recognized and referenced the right to earn an honest living. *See, e.g., Sewall v. Jones*, 26 Mass. (9 Pick.) 412 (Mass. 1830); *City of Memphis v. Winfield*, 27 Tenn. (8 Hum.) 707 (Tenn. 1848). This recognition of the historical right to earn an honest living obtained full recognition from the United States Supreme Court in *Dent v. West Viriginia*: "[i]t is undoubtedly the right of every citizen of the United States to follow any lawful calling, business, or profession he may choose, subject only to such restrictions as are imposed upon all persons of like age, sex, and condition." 129 U.S. 114, 121-22 (1889).

While *Dent* recognized that states reserve a police power in the face of this right, it defined the police power of the state over the right to earn a living as authorizing it "to prescribe all such regulations as in its judgment will secure or tend to secure them against the consequences of ignorance and incapacity, as well as of deception and fraud." *Id.* at 122. Nowhere in English or American case law does the state's police power enable it to totally suspend the constitutional right to pursue a living in the name of a public health emergency. *Dent* instead makes it crystal clear that the state's police power is only properly exercised when it protects the public from ignorance, incapacity, deception, and fraud in the carrying out of an occupation.

In the instant matter, Governor Lamont's order closing all "non-essential" businesses does not even fall within the outer penumbras of the proper parameters of the police power described in *Dent*. His order unilaterally suspends the right indefinitely and in a totally arbitrary manner. His order provides no definition as to what counts as an "essential" versus a "non-essential" business, thus rendering it hopelessly vague. Consequently, Governor Lamont's order is not a proper exercise of the state's police power and is unconstitutional on its face.

Even assuming that Governor Lamont's order properly falls within the outer penumbras of the state's police power, his order is not narrowly tailored to meet the state's compelling interest. Governor Lamont issued a broad and vague order that closes the on-premises operations of all "non-essential" businesses. There is no definition as to what constitutes an "essential" versus a "non-essential" business, thus rendering the order hopelessly vague. Moreover, Governor Lamont's order is far too broad. Instead of taking steps to enforce proper social distancing practices, his order simply shuts down any business that he and other executive officials deem to be non-essential. This aggregation of power is not a narrowly tailored application of the police power. It is the total foreclosing of the Plaintiffs' right to earn a living through the operation of their bar.

In the alternative, should the Court choose to adopt a broad view of the police power than the one described in *Dent*, Governor Lamont's order still fails to meet the reasonable requirements established by the Supreme Court's jurisprudence on the police power. The Supreme Court has clearly established that the state's police power enables it to institute extraordinary measures to protect public health. *See generally Jacobson v. Massachusetts*, 197 U.S. 11 (1905); *Zucht v. King*, 260 U.S. 174 (1922). However, the

8

Supreme Court has not closely examined the scope of the state's police power to institute

extraordinary measures. *Jacobson*, 197 U.S. at 25 ("[T]his court has refrained [sic] from

any attempt to define the limits of [the police] power").

Notwithstanding the broad deference that the Supreme Court has shown states in

their exercise of the police power,[4] the *Jacobson* Court made it quite clear that

> no rule prescribed by a state, nor any regulation adopted by a local
> governmental agency acting under the sanction of state legislation, shall
> contravene the Constitution of the United States, nor infringe any right
> granted or secured by that instrument. A local enactment or regulation, *even
> if based on the acknowledged police powers of a state, must always yield
> in case of conflict… with any right which [the Constitution] gives or secures.*

*Id.* at 25 (emphasis added).

Bearing this principle in mind, the *Jacobson* Court then stated that constitutional

rights are not absolute and that the state may impose regulations to secure "the general

comfort, health, and prosperity of the state…." *Id.* at 26. The *Jacobson* Court's underlying

explanation for this principle was that "[e]ven liberty itself, the greatest of all rights, is not

unrestricted license to act according to one's own will. It is only freedom from restraint

under conditions essential to the equal enjoyment of the same right by others." *Id.* at 26-

27. Briefly digressing, the point bears repeating that Governor Lamont's order does not

protect equal enjoyment of liberty for anyone. It indefinitely suspends liberty for everyone.

Even though the state's police power to secure the "the general comfort, health,

and prosperity of the state…" may result in a necessary burdening of constitutional rights,

the *Jacobson* Court explained that the courts still retained the power to review whether a

---

[4] "According to settled principles, the police power of a state must be held to embrace, at least, such reasonable regulations established directly by legislative enactment as will protect the public health and the public safety." *Jacobson*, 197 U.S. at 25.

regulation is "arbitrary, and not justified by the necessities of the case." *Id.* at 28. The "necessities of the case" review of the state's police power safeguards individuals when the police power is exercised "in particular circumstances and in reference to particular persons in such an arbitrary, unreasonable manner, or [goes] so far beyond what [is] reasonably required for the safety of the public, as to authorize or compel the courts to interference for the protection of such persons." *Id.* at 28.

An early example of this test was applied in the case of *Wong Wai v. Williamson*, 103 F. 1 (Cir. Ct. N.D. Cal. 1900). In *Williamson*, the San Francisco health authorities quarantined the residents of a broad section of San Francisco known as the "Chinese Quarter" and refused to release them until they submitted to a dangerous vaccination against the bubonic plague. *Id.* at 2-3. Judge Morrow, writing for the California Circuit Court held that the quarantine thrown around the entire district was unreasonable, unjust, and oppressive because it bore no relation to the officials' purported objectives. *Id.* at 7-8. Of special importance to Judge Morrow was that the petitioner showed that he had never been exposed to the bubonic plague and that the quarantine was being arbitrarily enforced against residents despite the complete lack of any evidence of confirmed cases of the bubonic plague in the vast majority of the quarantined area.[5] *Id.* at 2-3, 7-8. Because a vast majority of the quarantined area had not incurred any cases, Judge Morrow entered an injunction against the health officials for implementing unjust and unreasonable measures in violation of both the petitioner's right to equal protection of the law and his right to conduct lawful business. *Id.* at 9. However, Judge Morrow instructed

---

[5] Most of the residents were Chinese, and Judge Morrow devoted substantial time to discussing the racial motivations for the decision; however, the deciding factor for him was the complete lack of any evidence of confirmed cases of disease.

the health officials that they could impose a narrower quarantine on areas in which there were confirmed bubonic plague cases. *Id.*

Governor Lamont's broad and sweeping order is arbitrary in the sense that he allows so-called "essential" businesses – a definition equally vague as it is arbitrary – to remain open, provided that they follow social distancing guidelines. No such option was provided to the businesses such as the Plaintiffs' that have fallen on the wrong side of the Governor and his cronies' arbitrary definition of "essential." Just like in *Williamson*, Governor Lamont's order applies throughout the state, completely disregarding areas that do not have confirmed cases. Also, similar to *Williamson*, but in a different aspect, Governor Lamont's distinction between "non-essential" and "essential" businesses does not rest on any evidence that demonstrates that "non-essential" businesses that follow the prescribed social distancing guidelines pose any more of a risk to public health than "essential" businesses following the same guidelines. To boot, the Governor's order provides no enhanced guidelines or options to so-called "non-essential" businesses that would enable them to remain open – an option that the Plaintiffs have the imagination, the ability, and the willingness to implement at their business whether the Governor and his cronies have the time or the imagination to come up with such enhanced guidelines. Consequently, for the same reasons that the *Williamson* court found the San Francisco regulations unconstitutional because of their arbitrary unreasonableness, the Court should do the same with Governor Lamont's order.

Furthermore, Governor Lamont's order and its application contradict its necessity. For some reason, gun shops, gun ranges, golf courses, and pawnshops are considered essential businesses under Governor Lamont's order, but establishments such as the

Plaintiffs' business that serve food and drink are not. The establishments that remain open are allowed to remain open if they comply with social distancing guidelines – a form of compliance that the Plaintiffs are more than willing comply with. Governor Lamont's order and its application is self-contradicting on its necessity. It cannot not be justified and reflects a wholly arbitrary and politically malleable approach to this crisis and civil liberties.

Consequently, Governor Lamont's order cannot pass constitutional muster under both the *Dent* definition of the police power or the *Jacobson* definition, and the Court should stay its enforcement.

### B.  THE RIGHTS TO ASSEMBLE AND TO FREELY ASSOCIATE.

"An individual's freedom to speak, to worship, and to petition the government for the redress of grievances could not be vigorously protected from interference by the State unless a correlative freedom to engage in group effort toward those ends were not also guaranteed." *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984). Consequently, the Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Id.* Thus, the freedom to assemble and to freely associate extends far beyond protest marches or attempts to petition the various arms of government for relief.

In the past, government actions that have unconstitutionally infringed upon these freedoms include penalties or the withholding of benefits because of an individual's membership in a disfavored group, *Healy v. James*, 408 U.S. 169 (1972); disclosure of membership in a group seeking anonymity, *Brown v. Socialist Workers '74 Campaign Committee*, 459 U.S. 87 (1982); and interfering with internal organization or affairs of a

group, *Cousins v. Wigoda*, 419 U.S. 477 (1975). To constitutionally infringe on these freedoms, a government must do so by regulations that are "adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms." *Roberts*, 468 U.S. at 623.

The instant matter presents a situation that no court in our constitutional history has ever confronted. Instead of infringing on the freedoms of assembly and association, the Defendants have unilaterally suspended these rights for every resident of their respective jurisdictions including the Plaintiffs. A unilateral suspension of constitutional rights is no restriction narrowly tailored to meet a compelling state interest. Consequently, while the Defendants have a compelling state interest in preventing the spread of coronavirus, they have narrower alternative means to do so, namely, through social distancing measures such as the six-foot distance rule between individuals.

Furthermore, even if the Court determines that this falls under *Jacobson*'s definition for the emergency exercise of the police power instead of the heightened scrutiny mandated by *Roberts*, the Defendants' orders falter for the same reasons discussed in the previous section. The Defendants' orders are arbitrary in the sense that they allow the gathering of individuals at so-called "essential" businesses and organizations – a definition equally vague as it is arbitrary – to remain open, provided that they follow social distancing guidelines. No one counts how many people are in a supermarket at high noon. No one counts how many people are lined up outside a gun shop. The only thing that the Defendants care about is that the proper social distancing guidelines are observed. No such option was provided to the Plaintiffs or other individuals who would be more than willing and able to comply with the social distancing guidelines.

13

Just like in *Williamson*, the Defendants' orders apply throughout their jurisdictions, completely disregarding areas that do not have confirmed cases. Also, similar to *Williamson*, but in a different aspect, the Defendants' orders does not rest on any evidence that demonstrates that any gatherings where participants observe the prescribed social distancing guidelines pose any more of a risk to public health than the co-incidental gathering of people at a supermarket to shop who follow the same guidelines. In other words, the Defendants' order are completely arbitrary in their scope, and they leave a wide-open door for the abuse that Defendant Elicker has already engaged in: the false targeting of someone who has associated with his political opponents. Left unchecked, these broad regulations will result in further abuses across a myriad of areas including racially-motivated abuse of the *Williamson* kind, religious-motivated abuse, etc. Consequently, for the same reasons that the *Williamson* court found the San Francisco regulations unconstitutional because of their arbitrary unreasonableness, the Court should do the same with Governor Lamont's orders and Mayor Justin Elicker's orders.

Furthermore, the Defendants' orders and their application contradict their necessity. They are not regulating the number of people who go inside a supermarket at any given time. They are not regulating the number of people in lines standing outside gun shops or gun ranges. For some reason, these gatherings receive an exception from the Defendants' order, but other gatherings that will comply with the same social distancing guidelines will not. Thus, the Defendants' orders and their applications are self-contradicting on their necessity. They cannot not be justified and reflects a wholly arbitrary and politically malleable approach to this crisis and civil liberties.

14

Consequently, the Defendants' orders cannot pass constitutional muster, and the Court should stay their enforcement.

## III.   THE BALANCE OF HARDSHIPS DECIDEDLY WEIGHS IN FAVOR OF THE PLAINTIFFS.

If the Court does not grant the Plaintiffs' application for temporary restraining orders, they will suffer irreparable harm in the loss of their employees and, ultimately, their business. **Monsanto Affidavit, ¶¶ 6, 9-10; Amato Affidavit, ¶¶ 6, 9-10**. Furthermore, the Plaintiffs will also suffer irreparable injury in the loss of their constitutional rights during the time in which the Defendants' orders prevent them from gathering with their families, friends, customers, and likeminded individuals. They will never be able to regain or be compensated for the loss of their civil liberties while litigating against the Defendants' unconstitutional orders.

The public will not incur substantial injury as the result of a temporary restraining order on the Defendants' orders. Coronavirus will inevitably spread across the country according to all accounts regardless of whether people work or gather. The Defendants have alternative means to accomplish their public health objectives as discussed previously. Consequently, the substantial injury that a temporary restraining order would cause is nominal compared to the substantial injury that not issuing it would cause. If the temporary restraining order is not issued, every American subject to the Defendants' jurisdiction will suffer substantial injury in the loss of their constitutional rights.

Finally, while the Defendants may assert that the public interest lies in the control of the spread of coronavirus, the public interest that our nation and the people of the State of Connecticut have articulated for centuries is in constitutional liberties. Even in times of national emergencies, the public interest lies in the rights guaranteed to every American

and resident of Connecticut by the federal and state constitutions. While there is an undeniable public interest in combatting and containing coronavirus, it does not take precedent over the public interest established in the supreme law of the land and the state: the United States Constitution and the Connecticut Constitution.

Consequently, issuing the temporary restraining order would serve the public interest by protecting the constitutional liberties that our ancestors established and which have remained constant through every time of national crisis this nation has faced.

## <u>Conclusion</u>

For the foregoing reasons, the Plaintiff respectfully requests the Court to issue a temporary restraining order enjoining the enforcement of the Defendants' orders until such time as the Court can hear the parties' arguments for a preliminary injunction.

THE PLAINTIFFS

By <u>/s/ Kevin M. Smith /s/</u>
KEVIN SMITH
Pattis & Smith, LLC
383 Orange Street
New Haven, CT 06511
203.393.3017
203.393.9745 (fax)
Juris No. 427828
Ksmith@Pattisandsmith.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the date above a copy of the foregoing was served by certified mail and fax, if possible, upon the Defendants in accordance with the applicable law.