UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---

MICHAEL AMATO, JOY MONSANTO, and 50's
LOUNGE, LLC,
      Plaintiffs,

    v.

MAYOR JUSTIN ELICKER, MAYOR's
REPRESENTATIVE, and GOVERNOR NED
LAMONT,

      Defendants.

No. 3:20-cv-464 (MPS)

---

## RULING ON PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiffs Michael Amato and Joy Monsanto co-own and operate a restaurant—Plaintiff 50's Lounge, LLC—in New Haven, Connecticut. ECF No. 1 ¶ 9. The Plaintiffs filed this lawsuit on April 3, 2020, challenging actions that Defendant Ned Lamont (Governor of Connecticut) and Defendant Justin Elicker (Mayor of New Haven) took in response to the COVID-19 pandemic. On April 10, 2020, the Plaintiffs filed a motion for a temporary restraining order and preliminary injunction staying the enforcement of orders issued by Governor Lamont and Mayor Elicker that they claimed interfered with their business and their constitutional rights of assembly and association. For the reasons set forth below, the Plaintiffs' motion is denied.[1]

---

[1] The Plaintiffs filed their motion for temporary restraining order and preliminary injunction ("TRO motion") on April 10, 2020—one week after filing their complaint. Their brief in support of that motion discusses the allegations made in the complaint, as do the Defendants' opposition briefs and the Plaintiffs' reply brief. After full briefing was completed, and on the same day this ruling was filed, the Plaintiffs filed an amended complaint making a few new factual allegations. *See, e.g.*, ECF No. 30 ¶¶ 23–28. Because the parties have not addressed those new allegations or their significance to the issues raised by Plaintiffs' TRO motion, because no new or supplemental TRO motion was filed with the new complaint, and because the new allegations

I.      FACTS

        The following facts are drawn primarily from the Plaintiffs' Complaint, ECF No. 1, and

their affidavits, ECF Nos. 8, 11-2, 11-3, which were first filed five days after the complaint on

April 8, 2020.[2] I also take judicial notice of the contents of Governor Lamont's and Mayor

Elicker's relevant orders. Fed. R. Evid. 201(b).

        Plaintiffs Amato and Monsanto have operated the 50's Lounge in New Haven since 2017,

serving food and liquor "while hosting local artists in an on-site gallery." ECF No. 1 ¶ 11. The

restaurant also has hosted political events. *Id.* ¶ 12.

        As the Plaintiff's acknowledge, the "Coronavirus crisis began to take hold in

Connecticut" in March 2020. *Id.* ¶ 13. I assume familiarity with the COVID-19 pandemic—an

ongoing public health crisis with which all readers are familiar and which has resulted in

thousands of death in Connecticut. *See Coronavirus Disease 2019 (COVID-19)*, CT.gov (May

12, 2020), https://portal.ct.gov/Coronavirus (As of May 12, 2020, Connecticut had 33,765

confirmed COVID-19 cases, and 3,008 COVID-19-associated deaths.). Governor Lamont

announced the first positive case of COVID-19 in Connecticut on March 8, 2020. *Governor*

*Lamont Announces First Positive Case of Novel Coronavirus Involving a Connecticut Resident*,

Office of Governor Ned Lamont (Mar. 8, 2020), https://portal.ct.gov/Office-of-the-

Governor/News/Press-Releases/2020/03-2020/Governor-Lamont-Announces-First-Positive-

---

are not verified or otherwise supported by affidavit, I do not consider the new allegations in
ruling on the Plaintiffs' TRO motion.

[2] The affidavits submitted in support of the Plaintiffs' motion for a temporary restraining order
and preliminary injunction, ECF Nos. 11-2 & 11-3, are identical to the affidavits submitted on
April 8, 2020, ECF No. 8. Plaintiffs' affidavits are also substantively identical to each other; for
ease of reference, therefore, I cite only to Plaintiff Monsanto's affidavit, ECF No. 11-2.

Case-of-Novel-Coronavirus-Involving-a-Connecticut-Resident. On March 10, 2020, Governor

Lamont "declare[d] a public health emergency and civil preparedness emergency throughout the

State, pursuant to Sections 19a-131a and 28-9 of the Connecticut General Statutes." Governor

Ned Lamont, *Declaration of Public Health and Civil Preparedness Emergencies* (Mar. 10,

2020), https://portal.ct.gov/Coronavirus/Pages/Emergency-Orders-issued-by-the-Governor-and-

State-Agencies.

On March 15, the Plaintiffs decided to "close 50's Lounge for business," after

considering "the best course of action for their business, their employees, and the community

they served." ECF No. 1 ¶ 13.

After declaring a state of emergency, Governor Lamont issued a series of executive

orders implementing "community mitigation strategies to increase containment of the virus and

to slow down the transmission of the virus." Executive Order 7 at 1 (Mar. 12, 2020).[3] The

Governor's orders placed limits on nearly all areas of public life, including canceling classes at

public schools, suspending non-critical court operations, and restricting workplaces for non-

essential businesses. Most relevant to this case, Executive Order 7D, entered on March 16, 2020,

placed limits on restaurant, bar, and private club operations, requiring that "any restaurant or

eating establishment and any location licensed for on-premise consumption of alcoholic liquor . .

. shall only serve food or non-alcoholic beverages for off-premises consumption." Executive

Order 7D at 2. On March 19, Executive Order 7G provided "[f]urther [c]larification" of the limit

on bars and restaurants, stating that "[a]ny business with an active restaurant, café or tavern

---

[3] Copies of all Governor Lamont's executive orders relating to COVID-19 are available on
Connecticut's state website, and the orders relevant to this case are attached as exhibits to the
Governor's opposition brief. *See* Emergency Orders issued by the Governor and State Agencies,
https://portal.ct.gov/Coronavirus/Pages/Emergency-Orders-issued-by-the-Governor-and-State-
Agencies; ECF Nos. 21-1 at 2–20, 24–36 (Executive Order Nos. 7, 7D, 7G, 7N, 7H, and 7S).

liquor permit . . . shall be permitted to sell sealed containers of alcoholic liquor for pick up at such restaurant, café or tavern" under certain conditions. Executive Order 7G at 4. On March 20, 2020, the Governor ordered that "[n]on-essential businesses . . . shall reduce their in-person workforces at any workplace locations by 100% not later than March 23, 2020 at 8:00 p.m." and that "the Department of Economic and Community Development ("DECD") shall issue lawfully binding guidance about which businesses are essential." Executive Order 7H at 2–3 (Mar. 20, 2020). The order provided that essential businesses "shall include, but not be limited to, the 16 critical infrastructure sectors as defined by the Department of Homeland Security . . . including . . . food and beverage retailers . . . and restaurants, provided they comply with previous and future executive orders issued during the existing declared public health and civil preparedness emergency . . . ." *Id.* at 3.

Governor Lamont's executive orders also limited the number of persons who could gather for social or recreational purposes. *See* Executive Order Nos. 7, 7D, 7N. He issued the most restrictive such order on March 26, 2020, directing that "social and recreational gatherings . . . of six (6) or more people . . . are prohibited throughout the State of Connecticut. Executive Order 7N at 4 (Mar. 26, 2020). That order "d[id] not apply to government operations, private workplaces, retail establishments, or other activities that are not social or recreational gatherings." *Id.*

Mayor Elicker also declared a state of emergency on March 15, 2020. He issued an emergency order on March 19, 2020 stating that "gatherings of more than 10 people for social and recreational activities . . . are prohibited." Emergency Order No. 4 at 2 (Mar. 19, 2020), https://documentcloud.adobe.com/link/track/?pageNum=1&uri=urn%3Aaaid%3Ascds%3AUS%3A399de22f-5c51-411f-9a15-9fd5fd6bb0b5; ECF No. 23 at 5 n.5.

Plaintiffs aver that Governor Lamont's and Mayor Elicker's orders "present a great hardship to our business as we are losing money to pay our expenses every day, and we are not even bringing in a small amount of revenue to offset our expenses." ECF No. 11-2 ¶ 9. Specifically, the Amato and Monsanto affidavits state that the Governor's "executive order commanding 'non-essential' businesses to cease their on-site operations has completely cut off my business's revenue stream as we can no longer operate as a restaurant and a bar while the order remains in effect." *Id.* ¶ 6. "If these orders are not stayed," according to the Plaintiffs, "our business will incur financial hardship to the point where we may need to furlough our employees without pay, terminate their employment for the foreseeable future, and ultimately close our doors for good." *Id.* ¶ 10.

Plaintiffs Amato and Monsanto also each aver that "Governor Lamont's executive order banning all gatherings of more than five people completely hinders me from physically associating with anyone besides my family, thus denying me the ability to meet with my friends, customers, and like-minded people while the order remains in effect." *Id.* ¶ 7. The Plaintiffs make an identical statement regarding "Mayor Elicker's ban on gatherings exceeding ten people." *Id.* ¶ 8.

## II.    LEGAL STANDARD

"In the Second Circuit, the standard for issuance of a temporary restraining order ("TRO") is the same as the standard for a preliminary injunction." *Fairfield Cty. Med. Ass'n v. United Healthcare of New England*, 985 F. Supp. 2d 262, 270 (D. Conn. 2013), *aff'd as modified sub nom. Fairfield Cty. Med. Ass'n v. United Healthcare of New England, Inc.*, 557 F. App'x 53 (2d Cir. 2014). The standard the Plaintiffs must satisfy here requires them to show that they have suffered irreparable harm, that they have a clear or substantial likelihood of success on the

merits, that the balance of equities tips in their favor, and that an injunction is in the public

interest. Plaintiffs must show a likelihood of success on the merits—as opposed to the lesser

showing of "sufficiently serious questions going to the merits to make them fair ground for

litigation"—because they are challenging governmental action taken in the public interest under

a statute. *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105,

110 (2d Cir. 2014) (explaining that "governmental policies implemented through legislation or

regulations developed through presumptively reasoned democratic processes are entitled to a

higher degree of deference and should not be enjoined lightly"). The orders the Plaintiffs target

were issued under statutory authority granting the Governor and the Mayor broad powers to deal

with public health crises and other civil emergencies.[4] In addition, Plaintiffs must show a "clear"

or "substantial" likelihood of success on the merits—as opposed to just a likelihood of success

on the merits—because the relief they seek would suspend existing orders and thus change the

status quo, making the injunction they seek a "mandatory injunction" rather than just a

"prohibitory injunction." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883

F.3d 32, 37 (2d Cir. 2018) ("Because mandatory injunctions disrupt the status quo, a party

seeking one must meet a heightened legal standard by showing a clear or substantial likelihood

---

[4] Section 28-9 of the Connecticut General Statutes provides that, "[i]n the event of serious disaster . . . or in the event of the imminence thereof, the Governor may proclaim that a state of civil preparedness emergency exists, in which event the Governor may personally take direct operational control of any or all parts of the civil preparedness forces and functions in the state." Conn. Gen. Stat. § 28-9(a). "Upon such proclamation," the Governor may suspend statutory and regulatory requirements whenever he finds such requirements to "conflict with the efficient and expeditious execution of civil preparedness functions or the protection of the public health," may take "precautionary measures reasonably necessary in the light of the emergency," and "may take such other steps as are reasonably necessary in light of the emergency to protect the health, safety and welfare of the people of the state." *Id.* § 28-9(b). The Connecticut General Statutes similarly authorize the "chief executive officer of [a] municipality in which a major disaster or emergency occurs . . . [to] take such actions as he deems necessary to mitigate the major disaster or emergency." *Id.* § 28-8a(a).

of success on the merits" (internal quotation marks omitted)); *id.* at 37 & n.5 (explaining that the status quo is "the last, actual, peaceable uncontested status which preceded the pending controversy" (internal quotation marks omitted)). The final two factors—the balance of the equities and the public interest—merge when, as in this case, the Government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## III.    DISCUSSION

The Plaintiffs seek a temporary restraining order and preliminary injunction staying the enforcement of: (1) Mayor Elicker's "ten-person order," (2) "all of Governor Ned Lamont's executive orders banning non-essential gatherings of people," and (3) "Governor Lamont's executive order commanding bars and restaurants to close their on-premises operations." ECF No. 11 at 1–2.

As a preliminary matter, although the Plaintiffs request oral argument, they do not explicitly request an evidentiary hearing on their motion. "When parties are content in the district court to rest on affidavits, the right to an evidentiary hearing is waived." *Drywall Tapers & Pointers of Greater New York, Local 1974 of I.B.P.A.T., AFL-CIO v. Local 530 of Operative Plasterers & Cement Masons Int'l Ass'n*, 954 F.2d 69, 77 (2d Cir. 1992). Even if the Plaintiffs had requested a hearing, however, "there is no hard and fast rule in this circuit that oral testimony must be taken on a motion for a preliminary injunction or that the court can in no circumstances dispose of the motion on the papers before it." *Md. Cas. Co. v. Realty Advisory Bd. on Labor Relations*, 107 F.3d 979, 984 (2d Cir. 1997). "[W]hen essential facts are not in dispute," a district court is not required to hold an evidentiary hearing. *Id.*; *Safran Elecs. & Def. SAS v. iXblue SAS*, 789 F. App'x 266, 269 (2d Cir. 2019). Neither party in this case points to any

essential facts in dispute, and I deny the Plaintiffs' motion, taking as true the allegations in their complaint and the sworn statements in their affidavits.

### A. Mayor Elicker's Emergency Order No. 4

The Plaintiffs seek to stay the enforcement of Mayor Elicker's "ten-person order"—*i.e.*, Emergency Order No. 4, which prohibited "gatherings of more than 10 people for social and recreational activities." ECF No. 11 at 1; ECF No. 23 at 5 n.5. I agree with Mayor Elicker that the challenge to this order is moot, since the "Ten-Person Order was superseded by Governor Lamont's Executive Order No. 7N, Sec. 1, issued March 26, 2020, which . . . prohibits social or recreational gatherings of more than five (5) people statewide." ECF No. 23 at 9. Under Article III of the Constitution, federal courts have authority to adjudicate only "Cases" and "Controversies;" therefore, courts may not "decid[e] legal disputes or expound[] on law in the absence of such a case or controversy." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90 (2013). "[A]n actual controversy must exist not only at the time the complaint is filed, but through all stages of the litigation. . . . A case becomes moot—and therefore no longer a Case or Controversy for purposes of Article III—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Id.* at 90–91 (internal quotation marks omitted). Because Governor Lamont's Executive Order No. 7N was issued after Mayor Elicker's ten-person order and is more restrictive, any issues presented by the Mayor's order "are no longer live." *Id.* at 91. Therefore, I deny the Plaintiffs' request to stay enforcement of Mayor Elicker's ten-person order.[5]

---

[5] Even if this challenge were not moot, I would reject it for the same reasons articulated below regarding the challenge to Governor Lamont's Executive Order 7N banning gatherings of six or more people.

8

**B.** **Governor Lamont's Executive Order 7D**

The Plaintiffs also challenge "all of Governor Ned Lamont's executive orders banning non-essential gatherings of people," and "Governor Lamont's executive order commanding bars and restaurants to close their on-premises operations." ECF No. 11 at 1–2. In their complaint, the Plaintiffs point specifically to the Governor's orders on March 12 (Executive Order 7, banning "gatherings of 250 people or more for social and recreational activities"), March 16 (Executive Order 7D, banning "gatherings of 50 or more people" and limiting restaurants and bars to serving foods and beverages for off-premises consumption), March 19 (Executive Order 7G, clarifying that bars and restaurants may sell alcoholic liquor for off-premise consumption under certain circumstances), and March 26 (Executive Order 7N, banning "social and recreational gatherings . . . of six (6) or more people"). ECF No. 1 ¶¶ 19–22; ECF No. 21-1 at 2–20.

For the same reasons the challenge to Mayor Elicker's ten-person order is moot, any challenge to Governor Lamont's orders restricting gatherings to 250 people or to 50 people is also moot. Those earlier orders were explicitly superseded on March 26 by Executive Order 7N, which prohibited social and recreational gatherings of six or more people. Executive Order 7N at 4 ("[T]he prior order set forth in Executive Order No. 7D [regarding gatherings] . . . is hereby amended and modified . . . ."). Therefore, the only restrictions that are still in effect are Executive Order 7D's restrictions on restaurants and Executive Order 7N's restrictions on gatherings of six or more people. I address the challenge to Executive Order No. 7D first.

The Plaintiffs challenge Executive Order No. 7D as a "substantial and undue burden on the Plaintiff's liberty and right to pursue an honest living, thus violating the Fourteenth Amendment, . . . . Article IV, Section 2 of the United States Constitution . . . [and] Article the First, Section 8 of the Connecticut Constitution." ECF No. 1 ¶¶ 69–72. In support of their

9

motion, Plaintiffs aver that the Governor's order "commanding 'non-essential' businesses to cease their on-site operations has completely cut off [their] business's revenue stream as [they] can no longer operate as a restaurant and a bar while the order remains in effect." ECF No. 11-2 ¶ 6. They also claim that the "orders already present a great hardship to our business as we are losing money to pay our expenses every day, and we are not even bringing in a small amount of revenue to offset our expenses," and that "[i]f these orders are not stayed, our business will incur financial hardship to the point where we may need to furlough our employees without pay, terminate their employment for the foreseeable future, and ultimately close our doors for good." *Id.* ¶¶ 9–10.

   1. **Standing**

   For a litigation to constitute a "Case" within the meaning of Article III—and thus for federal subject matter jurisdiction to exist—a plaintiff must "establish that [it has] standing to sue." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). Standing is a jurisdictional prerequisite that the court must address before reaching the merits of the dispute. *All. for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 85 (2d Cir. 2006). To establish Article III standing, a plaintiff must show an injury in fact, which is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling." *Clapper*, 568 U.S. at 409. An "allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (emphasis deleted and internal quotation marks omitted).

   The injuries that the Plaintiffs assert as a result of Executive Order No. 7D are financial injuries to their business: they aver that the order "cut off [their] business's revenue stream,"

"present a great hardship to [their] business as [they] are losing money," and that "[their] business will incur financial hardship . . . and ultimately close [their] doors for good." ECF No. 11-2 ¶¶ 9–10. Under Connecticut law, an LLC is a "distinct legal entity whose existence is separate from its members." *O'Reilly v. Valletta*, 139 Conn. App. 208, 214 (2012). While the 50's Lounge, LLC may sue on its own behalf, "a member or manager . . . may not sue in an individual capacity to recover for an injury based on a wrong to the limited liability company." *Id.* Only the 50's Lounge, therefore, has standing to recover for its financial injuries.

Even if I construe Monsanto's and Amato's affidavits to be written in a representative capacity for 50's Lounge, neither the complaint nor the affidavits suggest that the asserted financial injuries are "fairly traceable" to Executive Order 7D or would be "redressable by a favorable ruling." The Plaintiffs admit in their complaint that they voluntarily "close[d] 50's Lounge for business on March 15, 2020." ECF No. 1 ¶ 13. And nowhere do they allege specific facts suggesting that they have sought to reopen or have specific plans to reopen once the orders are lifted. The loss of revenue therefore stems not from Executive Order 7D, issued on March 16, but rather from Monsanto's and Amato's decision to close their business on March 15. Moreover, Executive Order 7D does not order the closure of restaurants entirely; rather, it limits them to serving food and beverages for "off-premises consumption" only. The Plaintiffs do not indicate whether the 50's Lounge has served food or beverages in this manner since March 16. But the fact that they have the option to generate revenue in this manner is another reason their total loss of revenue is not "fairly traceable" to Governor Lamont's order.

The Plaintiffs have also failed to allege any facts suggesting that a favorable ruling would redress their injury: they do not allege that they would reopen their restaurant if the court enjoined enforcement of Executive Order 7D, nor do they allege that customers would return to

their restaurant if they reopened following the issuance of such an injunction.[6] Neither of these propositions is obvious under the current circumstances, both because of understandable public anxiety about the risk of infection from exposure to others and because of the pleas of state and local officials that Connecticut residents stay at home to curb the spread of the COVID-19 virus. *See, e.g.*, *Governor Lamont Launches Public Service Announcement Campaign Telling Residents to "Stay Safe, Stay Home,"* Office of Governor Ned Lamont (Apr. 6, 2020), https://portal.ct.gov/Office-of-the-Governor/News/Press-Releases/2020/04-2020/Governor-Lamont-Launches-Public-Service-Announcement-Campaign. Because the Plaintiffs voluntarily closed their restaurant before Executive Order 7D was issued and because they have not offered any allegations or testimony that the 50's Lounge would reopen if the Court grants a favorable ruling, they lack standing to challenge Executive Order 7D.

## 2. *Irreparable Harm*

Even if the 50's Lounge did have standing to challenge Executive Order 7D, a preliminary injunction would not be an appropriate remedy. "To satisfy the irreparable harm requirement, plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm. Thus, where there is an

---

[6] Plaintiffs' reply brief argues that Plaintiffs will seek "to reopen their business immediately" if they obtain relief from the relevant orders. ECF No. 27 at 3. But the Plaintiffs do not swear to this fact in their affidavits, nor do they allege it in their complaint. The Court cannot rely on factual representations in the parties' briefs to decide a motion for a preliminary injunction or temporary restraining order. *Societe Comptoir De L'Industrie Cotonniere, Etablissements Boussac v. Alexander's Dep't Stores, Inc.*, 190 F. Supp. 594, 601 (S.D.N.Y. 1961), *aff'd*, 299 F.2d 33 (2d Cir. 1962) ("As support for a preliminary injunction the court can consider only facts presented by affidavit or testimony.").

adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Bisnews AFE (Thailand) Ltd. v. Aspen Research Grp. Ltd.*, 437 F. App'x 57 (2d Cir. 2011); *Faively Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009). The injuries the Plaintiffs allege stemming from Executive Order 7D are financial, and the Plaintiffs have not shown that an award of damages would be inadequate. *See* ECF No. 11-2 ¶¶ 6, 9 (averring that Executive Order 7D "has completely cut off my business's revenue stream" and that "we are losing money to pay our expenses every day"). The lack of any specific allegations that the 50's Lounge would reopen immediately if the Court granted a favorable ruling also casts doubt on the Plaintiffs' claim of irreparable harm. *See Charette v. Town of Oyster Bay*, 159 F.3d 749, 757 (2d Cir. 1998) (remanding for further development of the record and noting that "we have not seen in the record any firm representation as to how quickly [plaintiff] desired and was prepared to reopen [his bar] in the event his motion were granted," that plaintiff "had made no effort to apply for a permit for [his bar]," and that these facts "may cast doubt on [plaintiff's] contention that irreparable harm will result from his inability to reopen [his bar] immediately.")

Courts have found irreparable harm when plaintiffs allege that their business would be shut down entirely if relief is not granted. *See Entergy Nuclear Vermont Yankee, LLC v. Shumlin*, 733 F.3d 393, 423 (2d Cir. 2013) (finding "irreparable injury if the defendants were able to enforce [the challenged statute that would] shut down [plaintiff's business]"); *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995) ("We have found irreparable harm where a party is threatened with the loss of a business."); *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. 1970) (noting that "the right to continue a business in which [plaintiff] had engaged for twenty years and into which his son had recently entered is not

measurable entirely in monetary terms"). The Plaintiffs here do aver that "[i]f these orders are

not stayed, our business will incur financial hardship to the point where we may need to furlough

our employees without pay, terminate their employment for the foreseeable future, and

ultimately close our doors for good." ECF No. 11-2 ¶ 10. But this statement is insufficient to

meet the Plaintiffs' burden of making a "clear showing" that "irreparable injury is *likely* in the

absence of an injunction" *Winter*, 555 U.S. at 22 (emphasis in original). The evidence in the

record suggests only that Plaintiffs "*may* . . . ultimately close [their] doors for good," ECF No.

11-2 ¶ 10; they do not allege or testify to any facts suggesting that permanent closure of their

business is likely or imminent. Because this alleged harm is only speculative, they have not

shown irreparable harm and are therefore not entitled to a preliminary injunction regarding

Executive Order 7D.

### 3. *Likelihood of Success on the Merits, Balance of Equities, Public Interest*

In light of my findings that the Plaintiffs lack standing to assert this claim and, in any

event, have not shown irreparable harm, I need not discuss their likelihood of success on the

merits at length. The Plaintiffs argue that "Governor Lamont's order closing all 'non-essential'

businesses" violates their constitutional "right to earn an honest living." ECF No. 11-1 at 7–8. I

need not decide whether the Constitution protects such a right because, even if it did, states have

broad powers to protect public health during epidemics. As discussed below, the Plaintiffs are

unlikely to succeed on their First Amendment claims because the Governor's order has a "real or

substantial relation" to public health and safety and the action is not "beyond all question, a

plain, palpable invasion of rights." *Jacobson v. Commonwealth of Mass.*, 197 U.S. 11, 31 (1905).

Moreover, Executive Order 7D does not deprive the Plaintiffs of their right to earn a living

through their restaurant: they are permitted to offer both food and beverages for off-premises

consumption. Thus, for the same reasons that the Plaintiffs' freedom of assembly claim is

unlikely to succeed, their right to pursue an honest living claim is even less likely to succeed.

I also need not reach the public interest in a temporary restraining order against Executive

Order 7D or the balance of equities. Because the Plaintiffs have not established standing or

irreparable harm, I deny their motion for a temporary restraining order or preliminary injunction

staying the enforcement of Executive Order 7D.

### C. **Governor Lamont's Executive Order 7N**

The Plaintiffs also allege that the Governor's "orders limiting the number of people who

may attend a gathering are unconstitutional restrictions" on the Plaintiffs' First Amendment right

to assemble and their "right to freely associate with [their] customers and [their] friends." ECF

No. 1 ¶¶ 59, 62.

#### 1. *Standing*

"[I]t is the burden of the party who seeks the exercise of jurisdiction in his favor . . .

clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the

dispute." *Thompson v. Cty. of Franklin*, 15 F.3d 245, 249 (2d Cir. 1994) (internal quotation

marks omitted). The standing inquiry focuses "on whether the party invoking jurisdiction had the

requisite stake in the outcome *when the suit was filed*." *Davis v. Federal Election Commission*,

554 U.S. 724, 734 (2008) (emphasis added). In First Amendment cases, courts have found

standing where plaintiffs alleged they were "chilled from exercising [their] right to free

expression or foregoes expression in order to avoid enforcement consequences." *Libertarian

Party of Connecticut v. Merrill*, No. 15-CV-1851 (JCH), 2016 WL 10405920, at *4 (D. Conn.

Jan. 26, 2016).

Here, the Plaintiffs' complaint does not adequately allege facts demonstrating that they suffered any First Amendment injury as a result of Executive Order 7N. First, they voluntarily "close[d] 50's Lounge for business on March 15, 2020," so the complaint does not make clear that their inability to assemble at their restaurant is fairly traceable to the Governor's order. ECF No. 1 ¶ 13. In addition, in their complaint, the Plaintiffs offer no *factual* allegations of First Amendment injury. Rather, they state legal conclusions that "Defendant Ned Lamont's orders limiting the number of people who may attend a gathering are unconstitutional restrictions on the Plaintiffs' liberty and right to assemble under the First Amendment," ECF No. 1 ¶ 59, and that "Lamont's orders limiting the number of people who may attend a gathering are an unconstitutional restriction that poses a substantial and undue burden on the Plaintiffs' liberty and right to freely associate with her customers and her friends, thus violating the First Amendment," *id.* ¶ 62. The Court need not accept as true "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Therefore, Plaintiffs' complaint, by itself, does not allege adequate facts to support standing to pursue these First Amendment claims.

The Plaintiffs did file affidavits five days after filing their complaint which make some additional allegations of injury. ECF No. 8. These affidavits should not be considered part of the pleadings since they were not attached as exhibits and since the complaint does not incorporate them by reference. *See Cortec Indus., Inc. v. Sum Holding L.P.* 949 F.2d 42, 47 (2d Cir. 1991) ("[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."); *see also Williams v. PMA Cos., Inc.*, 419 F. Supp. 3d 471, 483 (declining to consider affidavit filed after complaint as "integral" to the complaint since it was created after the complaint was filed).

16

If I consider the affidavits as evidence in support of this preliminary injunction motion, the affidavit offers only one, somewhat conclusory statement of First Amendment injury. The affidavits aver that "Governor Lamont's executive order banning all gatherings of more than five people completely hinders me from physically associating with anyone besides my family, thus denying me the ability to meet with my friends, customers, and like-minded people while the order remains in effect." ECF No. 11-2 ¶ 7. Read literally, this statement merely describes the requirements of Executive Order 7N. The affidavits do not explicitly state that the Plaintiffs have plans to physically associate or meet with anyone or even that the Plaintiffs *wish* to physically associate or meet with anyone. Moreover, the affidavits do not explicitly allege any injury existing "when the suit was filed," as required by *Davis.* 554 U.S. at 734.

But, construed liberally, the affidavits could suggest that, since the day Executive Order 7N was issued, the Plaintiffs have been chilled from exercising their rights of assembly and association. *Libertarian Party of Connecticut*, 2016 WL 10405920, at *4. And while the Plaintiffs' inability to meet with their customers is traceable to their voluntary closure, not to the Governor's orders, their alleged inability to meet with friends and like-minded people generally—*i.e.*, outside of their restaurant—is fairly traceable to Executive Order No. 7N and would be redressable by a favorable ruling on their motion. Therefore, even though it is questionable whether the Plaintiffs alleged or testified to sufficient facts to support standing, for the purposes of this motion, I will assume without deciding that the Plaintiffs have standing to bring their First Amendment challenges.

### 2. *Irreparable Harm*

I also assume without deciding that the Plaintiffs have shown irreparable harm stemming from Executive Order 7N. There is some "tension" in Second Circuit caselaw as to "whether

irreparable harm may be presumed with respect to complaints alleging First Amendment violations." *Bronx Household of Faith v. Board of Educ. Of City of New York*, 331 F.3d 342, 349 (2d Cir. 2003); *Amandola v. Town of Babylon*, 251 F.3d 339, 343 (2d Cir. 2001) ("[T]his Court has not spoken with a single voice on the issue of whether irreparable harm may be presumed with respect to complaints alleging the abridgement of First Amendment rights."). The Supreme Court has held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see Green Party of New York State v. New York State Bd. of Elections*, 389 F.3d 411, 418 (2d Cir. 2004) (presuming irreparable harm, citing *Elrod*, in case asserting violation of association rights). However, some cases in the Second Circuit have held that "irreparable harm must still be shown" in such cases "by establishing an actual chilling effect." *Bronx Household*, 331 F.3d at 349; *see Latino Officers Ass'n v. Safir*, 170 F.3d 167, 171 (2d Cir. 1999) ("Although we acknowledge that, as a theoretical matter, [the police department rule in question] may make some officers more reluctant to speak . . . this kind of conjectural chill is not sufficient to establish real and imminent irreparable harm."). *Bronx Household* attempted to harmonize the caselaw by holding that "in instances where a plaintiff alleges an injury from a rule or regulation that may only potentially affect speech, the plaintiff must establish a causal link between the injunction sought and the alleged injury," but "[w]here a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed." 331 F.3d at 349–50.

Executive Order No. 7N directly prohibits gatherings of six or more people for social or recreational purposes, so the chill on the freedom of assembly is sufficiently direct. Governor Lamont argues that Executive Order 7N does not "prohibit Plaintiffs from assembling" with

anyone—"[i]t merely limits the number of people that Plaintiffs may gather and associate with at any one time." ECF No. 21 at 11. But the freedom of assembly includes the right to gather in a crowd. Thus, though the caselaw in the Second Circuit on the presumption of irreparable harm is somewhat divided, it seems likely that Plaintiffs are entitled to a presumption of irreparable harm since they allege that Executive Order 7N directly limits their freedom of assembly. For the purposes of this motion, therefore, I assume that the Plaintiffs have met their burden of showing irreparable harm from Executive Order 7N and proceed to address whether they have shown a likelihood of success on the merits. *See Doninger v. Niehoff*, 527 F.3d 41, 47–48 (2d Cir. 2008) (assuming irreparable harm for purposes of appeal and proceeding to discussion of likelihood of success on the merits).

### 3. *Likelihood of Success on the Merits*

Even if the Plaintiffs have standing and have shown irreparable harm regarding Executive Order 7N, they have not shown a likelihood of success on the merits. The Plaintiffs allege that "Defendant Ned Lamont's orders limiting the number of people who may attend a gathering are unconstitutional restrictions on the Plaintiffs' liberty and right to assemble under the First Amendment to the United States Constitution" and that those same orders "are an unconstitutional restriction that poses a substantial and undue burden on the Plaintiffs' liberty and right to freely associate with her customers and her friends, thus violating the First Amendment to the United States Constitution." ECF No. 1 ¶¶ 59, 62.[7] Plaintiffs are not likely to succeed on the merits of either their assembly or their association claim.

---

[7] Plaintiffs' complaint also asserts that Governor Lamont's order limiting the size of gatherings violates the "right to assemble under Article the First, Section 14 of the Connecticut Constitution," ECF No. 1 ¶ 60; the "right to freely associate with her customers and her friends" under "the Ninth Amendment to the United States Constitution," *id.* ¶ 63; the right to freely associate under the Fourteenth Amendment to the United States Constitution, *id.* ¶ 64; the right

### a. __Freedom of Assembly Claim__

The First Amendment protects the "right of the people peaceably to assemble." U.S. Const. Amend. I. However, courts have long held that the constitutional right to assembly—like the right to free speech—is not absolute. *Jones v. Parmley*, 465 F.3d 46, 56 (2d Cir. 2006) ("First Amendment protections, while broad, are not absolute."). For instance, "government officials may stop or disperse public demonstrations or protests where 'clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears.'" *Id.* at 56–57 (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940)).

In this case, Governor Lamont argues that the Supreme Court's decision in *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), precludes the Plaintiffs from showing a clear likelihood of success on the merits of their First Amendment claims, since *Jacobson* establishes that states may "institute extraordinary measures to protect public health." ECF No. 21 at 18–19. For the reasons discussed below, I agree. And I also find that, even if *Jacobson* did not apply, the Plaintiffs' arguments are unlikely to succeed under traditional First Amendment analysis.

---

to freely associate under "Article the First, Section 8 of the Connecticut Constitution," *id.* ¶ 66; and the right to freely associate under "Article the First, Section 14 of the Connecticut Constitution," *id.* ¶ 67. However, the Plaintiffs' motion for a temporary restraining order and preliminary injunction does not make any arguments about the likelihood of success for these constitutional claims aside from the First Amendment claims and the "right to pursue an honest living" claim discussed above. Therefore, I find the Plaintiffs have not shown a likelihood of success on the merits for any of these other constitutional claims.

i.  **Government Authority During Public Health Crises**

In *Jacobson*, the Court addressed a Massachusetts law allowing municipalities to mandate and enforce the vaccination of inhabitants. 197 U.S. at 12–13. After being prosecuted for failing to comply with his town's mandatory smallpox vaccination, the plaintiff argued that the law violated his Fourteenth Amendment rights. *Id.* at 14. The Court held that "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members," *id.* at 27, including by "enact[ing] quarantine laws and health laws of every description," *id.* at 25. The Court mandated judicial deference in such situations:

> If there is any such power in the judiciary to review legislative action in respect of a matter affecting the general welfare, it can only be when that which the legislature has done comes within the rule that, if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has *no real or substantial relation to those objects*, or is, *beyond all question, a plain, palpable invasion of rights* secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.

*Id.* at 31 (emphasis added). Thus, while the power of state governments during an epidemic is, of course, not limitless, *see id.* at 28 (recognizing that state power during an epidemic could be exercised "in such an arbitrary, unreasonable manner, or might go so far beyond what was reasonably required for the safety of the public, as to authorize or compel the courts to interfere for the protection of such persons"), *Jacobson* requires that courts refrain from second-guessing state governments' responses unless there is "no real or substantial relation" between the actions and the public health and safety or the action is "beyond all question, a plain, palpable invasion of rights." *Id.* at 31. Even constitutional rights, including First Amendment rights, are subject to "reasonable conditions" to preserve public health. *Id.* at 26–27 ("Even liberty itself, the greatest of all rights, is not unrestricted license to act according to one's own will."); *Prince v. Massachusetts*, 321 U.S. 158, 166–67 (1944) ("The right to practice religion freely does not

21

include liberty to expose the community or the child to communicable disease or the latter to ill health or death."); *Phillips v. City of New York*, 775 F.3d 538, 542 (2d Cir. 2015) (finding that plaintiffs' argument that New York's mandatory vaccination requirement violated substantive due process "is foreclosed by the Supreme Court's decision in *Jacobson*," rejecting First Amendment Free Exercise challenge based on *Prince* and other precedent, and upholding the mandatory vaccination requirement).

I find that the standard articulated in *Jacobson* applies here. The decision has never been overturned, and the Second Circuit relied on the *Jacobson* standard in 2015 in *Phillips*. Since the outbreak of the COVID-19 pandemic, courts around the country have applied *Jacobson*'s standards to state orders intended to combat the virus. *See, e.g.*, *In re Abbott*, 954 F.3d 772, 784 (5th Cir. 2020) ("[W]hen faced with a society-threatening epidemic, a state may implement emergency measures that curtail constitutional rights so long as the measures have at least some 'real or substantial relation' to the public health crisis and are not 'beyond all question, a plain, palpable invasion of rights secured by the fundamental law.' (citing *Jacobson*)); *Cassell v. Snyders*, No. 20 C 50153, 2020 WL 2112374, at *6 (N.D. Ill. May 3, 2020); *Gish v. Newsom*, No. EDCV20755JGBKKX, 2020 WL 1979970, at *7 (C.D. Cal. Apr. 23, 2020).

The COVID-19 pandemic constitutes the sort of public health crisis—or "epidemic of disease which threatens the safety of [a community's] members"—contemplated by the *Jacobson* court. 197 U.S. at 27. Plaintiffs admit in their brief that "the state of Connecticut and our entire nation is facing a grave public health emergency due to the ongoing coronavirus pandemic." ECF No. 11-1 at 2. Indeed, as of May 12, 2020, Connecticut had 33,765 confirmed COVID-19 cases, and 3,008 COVID-19-associated deaths. *Coronavirus Disease 2019 (COVID-19)*, CT.gov (May 12, 2020), https://portal.ct.gov/Coronavirus. And Executive Order 7N has a

"real and substantial relation" to the state's goal of curbing the spread of the virus. The Order states that the restriction on the size of gatherings is imposed in light of recommendations from the CDC and the Connecticut Department of Public Health to implement "community mitigation strategies to increase containment of the virus and to slow transmission of the virus" and an increase in "COVID-19 infections and resulting hospitalizations . . in recent days, at the same time that residents of areas with high infection rates have arrived in Connecticut, creating a need to enact further mandatory distancing measures to limit the rate of spread of the disease." Executive Order No. 7N at 3 (Mar. 26, 2020).

Executive Order 7N is not "arbitrary," not "unreasonable," and not "beyond all question, a plain, palpable invasion of rights." *Jacobson*, 197 U.S. at 28, 31. The Order limits the size of social and recreational gatherings but does not altogether prohibit Plaintiffs from assembling with other people, nor does it limit with whom Plaintiffs may assemble. Courts have upheld more extreme measures taken in response to public health needs, including quarantines, which limit a person's right to assemble with *any* other person. *See Compagnie Francaise de Navigation a Vapeur v. Louisiana Bd. of Health*, 186 U.S. 380 (1902) (permitting involuntary quarantine of persons to prevent spread of communicable diseases); *Kansas v. Hendricks*, 521 U.S. 346, 366 (1997) (citing *Compagnie Francaise* with approval and noting, "we have never held that the Constitution prevents a State from civilly detaining those for whom no treatment is available, but who nevertheless pose a danger to others. A State could hardly be seen as furthering a 'punitive' purpose by involuntarily confining persons afflicted with an untreatable, highly contagious disease"); *Liberian Cmty. Ass'n of Connecticut v. Malloy*, No. 3:16-CV-00201(AVC), 2017 WL 4897048, at *10 (D. Conn. Mar. 30, 2017) (holding that public health officials did not violate clearly established law in quarantining the plaintiffs upon returning to

23

Connecticut after traveling to Ebola-affected countries in West Africa). Therefore, under the *Jacobson* standard, I conclude that Executive Order 7N is within the state's power to protect public health during an epidemic and is not a "plain, palpable" invasion of the Plaintiffs' right to freedom of assembly.

### ii.  Traditional First Amendment Analysis

Even if the deferential *Jacobson* standard did not apply to Executive Order 7N, Plaintiffs' freedom of assembly claim is unlikely to succeed under standard First Amendment analysis.

When analyzing state actions inhibiting the freedom of assembly, "the same analytical framework applies whether the First Amendment right being exercised is speech . . . or other 'expressive activity' such as assembly." *Johnson v. Perry*, 859 F.3d 156, 171 (2d Cir. 2017). Under free-speech doctrine, "even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). "Government regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech." *Id.*

Here, Executive Order 7N limits the manner of assembly by limiting the size, but the restrictions are content neutral. The order does not single out the Plaintiffs or the "like-minded" persons with whom they seek to gather, ECF No. 11-3 at 3, but limits all "social and recreational gatherings . . . including but not limited to, community, civic, leisure, or sporting events; parades; concerts; festivals; plays or live performances; conventions; and similar activities." Executive Order No. 7N at 4 (Mar. 26, 2020). The only exception is that "religious, spiritual or

24

worship gatherings shall . . . remain subject to the prohibition on gatherings of 50 or more people, provided that they employ reasonable and appropriate distancing measures." *Id.* The five-person limit also "does not apply to government operations, private workplaces, retail establishments, or other activities that are not social or recreational gatherings." *Id.* The application to *all* social and recreational gatherings makes clear that the limitation has nothing to do with the expressive content of any such gatherings.

The regulation of the size of gatherings is also "narrowly tailored to serve a significant governmental interest, and [it] leave[s] open ample alternative channels for communication." *Ward*, 491 U.S. at 791. As made clear in *Jacobson*, *Prince*, and other cases involving communicable diseases, governments certainly have a significant interest in protecting public health and in limiting the spread of disease. Executive Order 7N is also narrowly tailored: its restriction on the size of social and recreational gatherings specifically exempts religious services, private workplaces, and retail establishments—which present less obvious risks of physically close, sustained interaction than face-to-face social gatherings and which involve spiritual and economic needs the State may reasonably deem more pressing than such gatherings. Further, the restriction is temporary.[8] The government is not required to show that a content-neutral regulation of the time, place, or manner of expression is "the least restrictive or least

---

[8] When implemented, the restriction on the size of gatherings in Executive Order 7N was effective only through April 30, 2020. Executive Order No. 7N at 4 (Mar. 26, 2020). On April 10, 2020, Governor Lamont extended "Executive Order No. 7N, Section 1, prohibiting social and recreational gatherings of more than five (5) people" through May 20, 2020. Executive Order No. 7X at 5, https://portal.ct.gov/Coronavirus/Pages/Emergency-Orders-issued-by-the-Governor-and-State-Agencies. The fact that the Governor is reevaluating the restriction periodically as the pandemic progresses suggests he is tailoring his orders to changing circumstances.

intrusive means" of achieving its state interest. *Ward*, 491 U.S. at 798.[9] "Rather, the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* at 799. Finally, the limitation on the size of in-person social and recreational gatherings leaves open alternative channels of expression: Connecticut residents are free to communicate and express themselves in any means other than a large, in-person gathering. They may assemble in small groups and may communicate with any number of people over the phone or over videoconference. They may also participate in "car assemblies," as various groups of protesters during the pandemic have done. *See, e.g.*, *In-car protest against COVID-19 prevention efforts planned for downtown Columbia*, The State (Apr. 23, 2020), https://www.msn.com/en-us/news/us/in-car-protest-against-covid-19-prevention-efforts-planned-for-downtown-columbia/ar-BB133Tv1. Thus, even under standard First Amendment analysis, Plaintiffs have not shown that they would be likely to prove that this order is "substantially broader than necessary to achieve the government's interest" in limiting the spread of COVID-19. In short, they have not met their burden.

---

[9] This case is distinguishable from the recent Sixth Circuit decision in *Roberts v. Neace* for this reason. No. 20-5465, 2020 WL 2316679 (6th Cir. May 9, 2020). In *Neace*, the court applied strict scrutiny to the Kentucky Governor's order prohibiting "faith-based" "mass gatherings." *Id.* at *1. After concluding that the order was not a generally applicable law, the *Neace* court held that the Governor's order failed to utilize the "least restrictive means" to achieve the state's interest in limiting contagion, *id.* at *4 (noting that the Governor could have "insisted that the congregants adhere to social-distancing and other health requirements" or "cap the number of congregants coming together at one time," "just as the Governor has done for comparable secular activities"). Unlike Free Exercise cases involving laws that are not generally applicable, which must survive strict scrutiny, this case involves a content-neutral regulation of the right to assemble applicable to all social gatherings. The defendants are thus not required to show that they used the "least restrictive" means to accomplish their goals. Moreover, Governor Lamont did not prohibit gatherings altogether—he simply "cap[ped] the number of [people] coming together at one time," which the Sixth Circuit imagined as a less restrictive alternative to the Kentucky Governor's order.

Whether under the *Jacobson* standard—which I find applies to state action during the COVID-19 pandemic—or even under stricter First Amendment analysis, the Plaintiffs have not shown a likelihood of success on the merits—let alone a "clear" or "substantial" likelihood of success on the merits—of their claim that Executive Order 7N violates their right to freedom of assembly.

### b.  <u>Freedom of Association Claim</u>

The Plaintiffs have also failed to show a likelihood of success on the merits of their freedom of association claim. First, it is far from clear that the Plaintiffs have shown that they have a protected First Amendment right to associate with their "friends, customers, and like-minded people"—their only claimed associational injury. ECF No. 11-2 ¶ 7. In *Roberts v. U.S. Jaycees*, the Supreme Court explained that the "freedom of association" protects two types of association: (1) "choices to enter into and maintain certain intimate human relationships," and (2) association "for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." 468 U.S. 609, 617–18 (1984). The first type of association includes family relationships, which are "distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Id.* at 619–20. Associations among "a large business enterprise" or "fellow employees" are not constitutionally protected. *Id.* at 620; *see also City of Dallas v. Stanglin*, 490 U.S. 19, 24 (1989) ("[D]ance-hall patrons, who may number 1,000 on any given night, are not engaged in the sort of 'intimate human relationships' referred to in *Roberts*"); *Michaelidis v. Berry*, 502 F. App'x 94, 96–97 (2d Cir. 2013) (holding that relationships between plaintiffs and

"their restaurant customers, and their employees are not sufficiently intimate to implicate [First Amendment] protection").

Plaintiffs do not allege that Executive Order 7N has infringed on either type of association. As to the intimate human relationships, the Second Circuit has specifically held that the relationships between a restaurant owner and her customers or employees are not protected by the First Amendment, *Michaelidis*, 502 F. App'x at 96–97, and the Plaintiffs fail to allege or aver any facts suggesting that their relationships with "friends" and "like-minded people" are sufficiently intimate to implicate the First Amendment. *See Maselli v. Tuckahoe Union Free Sch. Dist.*, No. 17-CV-1913 (KMK), 2019 WL 3456581, at *6 (S.D.N.Y. July 31, 2019) (collecting Second Circuit cases on the freedom of association and "declin[ing] to hold, on the non-specific facts alleged in the [complaint], that Plaintiff's relationship with [her brother-in-law] is entitled to First Amendment protection"); *Gross v. City of Albany*, No. 14-CV-736, 2015 WL 5708445, at *10 (N.D.N.Y. Sept. 29, 2015) (holding that "friendships, however close, are insufficient to state a claim under the First Amendment"). And as to association "for the purpose of engaging in those activities protected by the First Amendment," the Plaintiffs have not alleged or provided any evidence regarding the purpose of their association with "friends, customers, and like-minded people." It is Plaintiffs' burden to show that gathering with these people in person is constitutionally protected, and they have failed to do so.

Finally, even if the Plaintiffs did have a First Amendment right to associate in-person, I would find that Executive Order 7N was a reasonable state action under *Jacobson*, or was otherwise constitutional under traditional First Amendment analysis, for the same reasons articulated above regarding the freedom of assembly claim.

**4.** ***Balance of Equities and the Public Interest***

Because I find that the Plaintiffs have failed to show a likelihood of success on the merits of their First Amendment challenges to Executive Order 7N, I need not discuss the public's interest in a temporary restraining order or the balance of equities.

## IV.    CONCLUSION

For all the foregoing reasons, the Plaintiffs' motion for a temporary restraining order and preliminary injunction, ECF No. 11, is DENIED.

IT IS SO ORDERED.


Dated:  May 19, 2020
        Hartford, Connecticut

                                    _____/s/_____
                                    Michael P. Shea, U.S.D.J.