**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MICHAEL AMATO, *et al.*, | : | 3:20-cv-00464-MPS |
| *Plaintiffs*, | : | |
| v. | : | |
| MAYOR JUSTIN ELICKER, *et al.* | : | |
| *Defendants*. | : | July 8, 2020 |

**Defendant Governor Lamont's Memorandum in Support of his Motion to Dismiss**
**Plaintiffs' Second Amended Complaint**

Connecticut is in the midst of responding to a pandemic of COVID-19, a novel and deadly disease. The Supreme Court has long held—and recently reiterated—that the United States Constitution gives the Governor the primary authority, and especially broad latitude, to respond to the pandemic and that courts should not second-guess his decisions unless they are clearly outside the bounds of that latitude. Second-guessing is precisely what Plaintiffs ask this Court to engage in here, based on a minimal factual and legal basis. This Court should dismiss Plaintiffs' claims against the Governor in their entirety.

**Plaintiffs' Allegations and Factual Background**

**I.    Plaintiffs' Allegations in their Second Amended Complaint**

Plaintiffs are Joy Monsanto, Michael Amato, and 50's Lounge, LLC, a restaurant with a full-service liquor license that Plaintiff Monsanto and Plaintiff Amato own and operate. *Second Amended Complaint*, ¶¶ 2-4, 9 & 11 (ECF No. 41) ("*2dAC*"). Plaintiffs acknowledge that these times are "unprecedented," *id.* at ¶ 1, due to "the Coronavirus crisis that began to take hold in Connecticut" in March 2020 and led Plaintiffs—in the best interest of "their business, their employees, and the community they served"—to "close 50's Lounge for business on March 15, 2020." *Id.* at ¶ 13. Consistent with that allegation, Plaintiff Monsanto represented to "concerned citizens, elected officials, and newspaper reporters" that Plaintiffs' closure of 50's Lounge was "voluntary" and "implemented to help flatten the curve of the coronavirus outbreak." *Id.* at ¶ 14.

"Plaintiffs . . . closed proactively on March 15." *Id*. at ¶ 18. The only Order the Governor had issued at that time that is referenced in the Complaint was a March 12, 2020 Order "banning large gatherings of 250 people or more for social and recreational events including community and civic events." *Id*. at ¶ 19. However, Plaintiffs allege that "[a]fter carefully considering the situation, Plaintiffs decided that any risks associated with coronavirus were nominal and that they would fully reopen their business approximately a week after they voluntarily closed it." *Id*. at ¶ 24. According to Plaintiffs, they decided not to reopen at all because of the Governor's Orders (even though the Orders allowed restaurants and bars to reopen for some purposes, *see id*. at ¶¶ 20-21) and their inability to fully reopen is damaging their business. *See id*. at ¶¶ 26-28.

Plaintiffs' Complaint has twelve Counts. Only Counts Eight through Twelve are directed at the Governor. *See id*. at pp. 11-14. Count Eight alleges violations of Plaintiffs' rights of assembly under the First Amendment, and Article First, § 14 of the Connecticut Constitution. *See id*. at ¶¶ 64-66. Count Nine alleges violations of Plaintiffs' rights of freedom of association under the First, Ninth, and Fourteenth Amendments, and Article First, §§ 8 and 14 of the Connecticut Constitution. *See id*. at ¶¶ 67-73. Count Ten alleges violations of Plaintiffs' constitutional rights to pursue a living under the Privileges or Immunities and Due Process Clauses of the Fourteenth Amendment, as well as Article First, § 8 of the Connecticut Constitution. *See id*. at ¶¶ 74-77. Count Eleven alleges violations of Plaintiffs' right to receive compensation for a taking of property under the Fifth Amendment, and Article First, § 11 of the Connecticut Constitution. *See id*. at ¶¶ 78-80. Finally, Count Twelve alleges violations of due process under the Fourteenth Amendment. *See id*. at ¶¶ 81-83.

Plaintiffs seek compensatory damages from Governor Lamont. *Id*. at ¶ 86. Plaintiffs also ask this Court to issue "[a] declaratory judgment invalidating Governor Lamont's restrictions on

businesses and gatherings as unconstitutional and an injunction permanently staying their enforcement." *Id*. at p. 15, ¶ D. Plaintiffs further indicate that they want a jury trial. *Id*. at 15.

## II.     The Changes to the Governor's Executive Orders that Impact Plaintiffs' Claims

Plaintiffs' allegations in their Second Amended Complaint are based on the same four Executive Orders ("the Orders") that the Governor issued in the time period between March 16th and March 26, 2020 that were the basis for Plaintiffs' Original Complaint. *2dAC*, ¶¶ 19-22 (referencing the Orders that form the basis for Plaintiffs' claims); *see also Challenged Orders* (A-1-19). Those are:

> the Governor's orders on March 12 (Executive Order 7, banning 'gatherings of 250 people or more for social and recreational activities'), March 16 (Executive Order 7D, banning 'gatherings of 50 or more people' and limiting restaurants and bars to serving foods and beverages for off-premises consumption), March 19 (Executive Order 7G, clarifying that bars and restaurants may sell alcoholic liquor for off-premise consumption under certain circumstances), and March 26 (Executive Order 7N, banning 'social and recreational gatherings . . . of six (6) or more people').

*Amato v. Elicker*, 2020 WL 2542788, at *1 n.1 (D. Conn. May 19, 2020) (Shea, J.) (ECF No. 32) (quoting the referenced Orders). Key aspects of the Orders are no longer operative. Specifically, the Orders regarding restaurant and bar operations Plaintiffs reference in paragraphs 21 and 22 have been modified in several respects, most recently in Executive Order ZZ (issued on June 16th), to allow indoor dining subject to safety rules. (A-24, 27, 31). In addition, Order ZZ authorized the Department of Economic and Community Development ("DECD") to establish legally binding "Rules for Gatherings and Venues" and "Sector Rules for Outdoor Events" (the "Rules").  Current Rules authorize indoor gatherings of up to 25 people and outdoor gatherings of up to 100 people.  (A-28).

Although those changes went into effect before Plaintiffs filed their Second Amended Complaint, Plaintiffs' do not reference those changes or allege any facts to support a conclusion

that Plaintiffs are impacted by any restrictions that remain and, if so, how. Notably, although Plaintiffs allege that they voluntarily and temporarily closed before any of the Orders required Plaintiffs to limit their business (*2dAC*, ¶ 23), and that they are harmed by the Governor's "prohibitory bar on their reopening," *2dAC*, ¶ 26, Plaintiffs' Complaint correctly acknowledges that the Orders did not completely prohibit Plaintiffs from re-opening. *2dAC*, ¶¶ 20-21.

## Procedural Background

Plaintiffs filed their Original Complaint on April 3, 2020. (ECF No. 1). A week later, they filed a Motion for a Temporary Restraining Order or Preliminary Injunction ("TRO/PI Motion"). (ECF No. 11). The Governor filed both an Opposition to Plaintiffs' Motion and a Motion to Dismiss Plaintiffs' Original Complaint on April 27, 2020. (ECF Nos. 21 & 22). The deadline for Plaintiffs to respond to the Governor's Motion to Dismiss was May 18, 2020. (ECF No. 22). Plaintiffs did not file a response or amend their Complaint by that date.

On May 19, 2020, Plaintiffs filed a putative Amended Complaint.[1] On the same date, this Court denied Plaintiffs' TRO/PI Motion. *Amato*, 2020 WL 2542788 (ECF No. 32). On May 20, 2020, the Court denied the Governor's initial Motion to Dismiss without prejudice and Ordered that the Governor could file a renewed Motion to Dismiss on or before June 10, 2020. (ECF No. 33). The Court later Ordered that Plaintiffs make any amendments to their Complaint by June 17, 2020 and Ordered that it would "**not allow further amendments of the Complaint**" after that date. (ECF No. 35) (emphasis in the Order). As a result, the Governor requested—and this Court granted—an extension of time through July 8, 2020 in which to respond to Plaintiffs' then-operative Complaint (which is Plaintiffs' Second Amended Complaint, ECF No. 41).

---

[1] Plaintiffs' first Amended Complaint was filed outside the time permitted under Rule 15(a)(1)(B) and therefore was arguably "a nullity, and not an operative pleading" because Plaintiffs neither sought opposing counsel's consent nor filed a motion requesting this Court's leave to amend. *Sivokonev v. Cuomo*, 2020 WL 1316494, at *3 (W.D.N.Y. Mar. 19, 2020). However, the Court treated it as operative and gave Plaintiffs a second opportunity to amend.

## Argument

### I.     The Standard for this Motion to Dismiss

This Motion is pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6). "A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court lacks the statutory or constitutional power to adjudicate it." *Cortlandt St. Recov. Corp. v. Hellas Tel.*, 790 F.3d 411, 416-17 (2d Cir. 2015) (quotation marks and citation omitted).

"A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). To meet that burden, a plaintiff "must allege facts that affirmatively and plausibly suggest that it has standing to sue" and the court "need not 'credit a complaint's conclusory statements without reference to its factual context.'" *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 & 146 (2d Cir. 2011) (Per Curiam) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1954 (2009)). Where a defendant files a Rule 12(b)(1) motion, the court "may refer to evidence outside the pleadings" to decide the motion. *Id*. Although the court accepts all material factual allegations in the complaint as true, it cannot draw inferences from the complaint favorable to the plaintiff or rely on conclusory statements in the Complaint. *See, e.g.*, *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004) ("*J.S.*") (citing *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998)).

To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (quotation marks omitted). This Court must "accept as true all factual allegations and draw from them all reasonable inferences; but [it is] not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Id*. (quotation marks

omitted).[2]

## II.     The Eleventh Amendment Bars Most of Plaintiffs' Claims Against the Governor in his Official Capacity

Plaintiffs sue the Governor under both federal and state law "in his individual and official capacity," *2dAC*, ¶ 7, seeking damages, *id*. at ¶ 86, as well as "[a] declaratory judgment invalidating Governor Lamont's restrictions on businesses and gatherings as unconstitutional and an injunction permanently staying their enforcement." *Id*. at p. 15, ¶ D. Even after Plaintiffs have had two opportunities to amend after the Governor filed his initial Motion to Dismiss, Plaintiffs still do not make clear which claims Plaintiffs bring in which capacity.

This Court should dismiss the Complaint to the extent, if any, it could be construed as asserting official capacity damages claims against the Governor. "The Eleventh Amendment bars the award of money damages against state officials in their official capacities." *Ford v. Reynolds*, 316 F.3d 351, 354 (2d Cir. 2003).[3] That bar applies to all of Plaintiffs' claims regardless of whether they are based on federal or state law. *See, e.g.*, *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984) ("*Pennhurst*").

That includes Plaintiffs' takings claims in Count Eleven. Every "court of appeals to have decided the question has held that the Takings Clause does not override the Eleventh Amendment." *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 553 (4th Cir. 2014) (citing cases); *see also Nat'l R.R. Passenger Corp. v. McDonald*, 978 F. Supp. 2d 215, 227–35 (S.D.N.Y. 2013), *aff'd on other grounds*, 779 F.3d 97 (2d Cir. 2015) (holding that the Eleventh Amendment barred

---

[2] Five days after filing their Original Complaint, the individual Plaintiffs filed Affidavits, which Plaintiffs do not refer to in the Second Amended Complaint. This Court should not consider those Affidavits when deciding this Motion. *See Williams v. PMA Cos., Inc.*, 419 F. Supp. 3d 471, 483 (N.D.N.Y. 2019) ("While district courts in the Second Circuit may consider such belated attachments when deciding a motion to dismiss for failure to state a claim if the plaintiff is proceeding *pro se*, here Plaintiff is not proceeding *pro se*."). In any event, Plaintiffs' Affidavits were conclusory and provided no basis to rebut any of the arguments in this Memorandum.

[3] A Rule 12(b)(1) motion is the correct vehicle to raise the Eleventh Amendment. *See, e.g.*, *Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990)).

takings claims, applying *Knight v. New York*, 443 F.2d 415 (2d Cir. 1971)).[4] Consistent with those appellate decisions, a district court recently held that the Eleventh Amendment bars takings claims arising out of a Governor's Executive Orders in response to the COVID-19 pandemic. *Martinko v. Whitmer*, 2020 WL 3036342, at *2 n.2 (E.D. Mich. June 5, 2020).

The Eleventh Amendment also bars two separate categories of Plaintiffs' claims seeking equitable relief. The first barred category is Plaintiffs' official capacity claims to the extent they seek retrospective, as opposed to prospective, equitable relief based on alleged federal constitutional violations.[5] The Supreme Court has long held that "[t]he Eleventh Amendment bars federal courts from issuing retrospective declaratory relief against state officials for past violations of federal law." *Szymonik v. Connecticut*, 2020 WL 1650329, at *3 (2d Cir. Apr. 3, 2020) (Summary Order) (citing cases including *Green v. Mansour*, 474 U.S. 64 (1985)). The same is true of retrospective injunctive relief. *See, e.g.*, *Bonilla v. Semple*, 2016 WL 4582038, at *3 (D. Conn. Sept. 1, 2016) (Bolden, J.) (citing *Edelman v. Jordan*, 415 U.S. 651, 663-68 (1974), and *Pennhurst*, 465 U.S. at 105). Therefore, the Eleventh Amendment bars Plaintiffs' claims to the extent they ask this Court to declare that Orders, or portions of Orders, that are no longer operative violated the federal Constitution. *See, e.g.*, *Green*, 474 U.S. at 68-74 (holding that the Eleventh Amendment barred claims as retrospective where the law changed post-filing to render prospective relief unnecessary).

The second category of Plaintiffs' official capacity equitable claims the Eleventh Amendment bars is Plaintiffs' claims asking this Court to declare the Orders inconsistent with

---

[4] Those decisions remain good law. *See, e.g.*, *Bay Point Properties, Inc. v. Mississippi Transp. Comm'n*, 937 F.3d 454, 456 (5th Cir. 2019), *cert. denied sub nom.*, 2020 WL 1496635 (U.S. Mar. 30, 2020) (holding that *Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162 (2019), did not alter Eleventh Amendment takings precedent).

[5] To the extent Plaintiffs seek declaratory and injunctive relief against the Governor in his individual capacity, this Court should dismiss any such claims because that relief is not available against a state official in his individual capacity. *See, e.g.*, *Thurmand v. Univ. of Connecticut*, 2019 WL 369279, at *3–4 (D. Conn. Jan. 30, 2019) (Hall, J.) (citing cases, including *Frank v. Relin*, 1 F.3d 1317, 1327 (2d Cir. 1993)).

the Connecticut Constitution and enjoin their enforcement on that basis. The Eleventh Amendment bars claims where "a plaintiff alleges that a state official has violated *state* law." *Pennhurst*, 465 U.S. at 106 (emphasis in *Pennhurst*); *see also Raygor v. Regents of Univ. of Minnesota*, 534 U.S. 533, 541–42 (2002) (holding that the supplemental jurisdiction statute does not "authorize district courts to exercise jurisdiction over claims against nonconsenting States"). It is well-established that "a federal court may not sit in judgment of whether a State or a State official has complied with its own law." *Dennehy v. Soto*, 2018 WL 4936003, at \*2 (D. Conn. Oct. 11, 2018) (Shea, J.) (citing *Pennhurst*, 465 U.S. at 106).

### III.    Plaintiffs' Claims for Declaratory and Injunctive Relief are Moot

Plaintiffs' claims against the Governor are based on four Orders that the Governor issued in the time period between March 16th and March 26, 2020. *2dAC*, ¶¶ 19-22 (referencing the Orders that form the basis for Plaintiffs' claims); *see also Challenged Orders* (A-1-19). Key aspects of the challenged Orders are no longer operative. Specifically, the Orders regarding restaurant and bar operations Plaintiffs reference in paragraphs 21 and 22 have been modified in several respects, most recently in Executive Order ZZ (issued on June 16th), to allow indoor dining subject to safety rules. (A-24, 27, 31). In addition, DECD Rules currently permit indoor and outdoor gathering of 25 and 100 people respectively.  (A-28)

That renders Plaintiffs' prospective claims moot. In denying Plaintiffs' TRO/PI Motion, this Court recognized that challenges to local COVID-19 Orders become moot if and when the challenged Orders are superseded by a new state Order. *See Amato* 2020 WL 2542788, at \*4.[6] Other courts have reached similar conclusions as to superseding state Orders. *See, e.g.*, *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 612 (6th Cir. 2020) (noting that a case

---

[6] *Conn. Citizens Def. League, Inc. v. Lamont*, 2020 WL 3055983, at \*7–9 (D. Conn. June 8, 2020) (Meyer, J.), is not to the contrary. There, the defendants argued that a challenge became moot based on a voluntary change in agency conduct before a change in the controlling Executive Order.

challenging a Governor's COVID-19 Orders as applied to a church would "become moot . . . when the Governor has agreed to permit places of worship to reopen"); *Ministries v. Newsom*, 2020 WL 2991467, at *2–3 (S.D. Cal. June 4, 2020) (denying a motion for preliminary injunction as moot where the challenged Orders were superseded by new Orders); *Cameron v. Beshear*, 2020 WL 2573463, at *2 (E.D. Ky. May 21, 2020) (holding that a challenge to an Order became moot, and that neither the voluntary cessation exception nor the capable or repetition yet evading review exception avoided mootness); *Spell v. Edwards*, 2020 WL 2509078, at *5–6 (M.D. La. May 15, 2020) (holding challenge to an Order moot).[7]

Those decisions are consistent with Second Circuit precedent. *See, e.g.*, *E.I. Dupont de Nemours Co. v. Invista B.V.*, 473 F.3d 44, 47 (2d Cir. 2006); *Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 71 (2d Cir. 2001); *Murphy*, 270 F.2d at 421. The Governor hopes that Connecticut will continue its progress against COVID-19 and that he will never need to re-instate restrictions like the challenged restrictions in the future. But it would be impossible—and irresponsible—for the Governor to "state with certainty" to this Court that it will "never be necessary" to re-impose restrictions in the future if there is resurgence of the virus. *Murphy*, 270 F.2d at 420.

Plaintiffs' request that this Court enjoin the now-superseded restrictions is still moot; "the mere possibility that at some future date conduct similar to that engaged in by the defendants in the past may again be contemplated is not sufficient to prevent a dismissal for mootness." *Id*. (citing *United States ex rel. Norwegian Nitrogen Products Co. v. United States Tariff Commission*, 274 U.S. 106 (1927)). The nature of any future response to the virus "will be redetermined," *id*. at 421, by the Governor based on the circumstances that exist at that time in the exercise of his primary constitutional authority to protect people in Connecticut from

---

[7] At least one court has held that the voluntary cessation exception to mootness applied to a Governor's change to a COVID-19 Order. *See Antietam Battlefield KOA v. Hogan*, 2020 WL 2556496, at *4–5 (D. Md. May 20, 2020). *Hogan* is inconsistent with Second Circuit authority. *See, e.g.*, *Murphy v. Benson*, 270 F.2d 419, 421 (2d Cir. 1959).

9

infectious disease. *See, e.g.*, *S. Bay United Pentecostal Church v Newsom*, 140 S. Ct. 1613, 1613 (2020) ("*S. Bay*") (Roberts, C.J., concurring in denial of application for injunctive relief) ("Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'" (quoting *Jacobson v. Commonwealth of Mass.*, 197 U.S. 11, 38 (1905)). The deference *Jacobson* gives the Governor in these circumstances further counsels against this Court reaching out to decide issues that are moot—if this Court rules now in a factual vacuum, it could unwittingly constrain the Governor's constitutional authority to respond to future spikes in this novel disease in ways that could be deadly for reasons that are not evident to anyone at this point. *See id.*

## IV.     Plaintiffs Have Not Met Their Burden to Show Standing for Any of their Claims

To the extent, if any, Plaintiffs' claims are not moot, this Court has already correctly held that "[t]he injuries that the Plaintiffs assert as a result of Executive Order No. 7D are financial injuries to their business" and that "[o]nly the 50's Lounge, therefore, has standing to recover for its financial injuries." *Amato*, 2020 WL 2542788, at \*5. That requires dismissal of the individual Plaintiffs' claims to the extent they are based on financial injuries. *See id.*[8]

That leaves the financial claims as to 50's Lounge and the individual Plaintiffs' claims to the extent, if any, their claims are independent of claimed financial injury to 50's Lounge. 50's Lounge does not have standing to assert many of the federal constitutional rights on which Plaintiffs' claims are based. Although LLCs and similar entities have standing to assert some rights, "not all constitutional protections apply to corporations or apply as fully as they do to

---

[8] The distinction between mootness and standing hinges on the state of the real-world facts at the time Plaintiffs filed their Original Complaint. *See, e.g.*, *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 126 (2d Cir. 2020) ("*Fed. Defs.*") (noting that standing is based on "whether the party invoking jurisdiction had the requisite stake in the outcome *when the suit was filed*" (emphasis in *Fed. Defs.*)). As the Governor will discuss in more detail below, Plaintiffs' amendments did not cure Plaintiffs' lack of standing.

natural persons."[9] *Consol. Edison Co. of New York v. Pataki*, 292 F.3d 338, 347 (2d Cir. 2002). This is because the Constitution contains "[c]ertain 'purely personal' guarantees [that] are unavailable to corporations and other organizations because the 'historic function' of the particular guarantee has been limited to the protection of individuals." *Id.* (quoting *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 778 n.14 (1978)). "Whether a right is purely personal 'depends on [its] nature, history, and purpose.'" *Id.* (quoting *Bellotti*, 435 U.S. at 778 n.14).

Here, Count Eight alleges violations of the right of assembly under the First Amendment. *2dAC*, ¶¶ 64-66. The LLC lacks standing to assert this claim because "a corporation cannot be deprived of freedom . . . of assembly." *Merco Properties, Inc. v. Guggenheimer*, 395 F. Supp. 1322, 1325 (S.D.N.Y. 1975)[10] (citing *Hague v. C.I.O.*, 307 U.S 496, 527 (1939) (opinion of Stone, J.; see also opinion of Roberts, J., *id.*, at 514)). This conclusion is unsurprising, as the First Amendment's text indicates that the right of assembly is a personal right—the Amendment protects "the right of the people to peaceably assemble." U.S. Const., Amend. I.

With respect to Count Nine, Plaintiffs make a conclusory allegation that the Orders pose an "undue burden" on their "right to freely associate with their customers and friends." *2dAC*, ¶¶ 67-73. The right to associate with customers and friends would fall under the "intimate association" line of cases. *See Adler v. Pataki*, 185 F.3d 35, 42 (2d Cir. 1999). Because this intimate association right "receives protection as a fundamental element of personal liberty," *Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984), the LLC lacks standing to raise it.

---

[9] When determining whether a constitutional provision is applicable to a LLC, courts have treated LLCs like corporations. *See, e.g.*, *Aqua Harvesters, Inc. v. New York State Dep't of Envtl. Conservation*, 399 F. Supp. 3d 15, 79 n.59 (E.D.N.Y. 2019); *Swedenburg v. Kelly*, 2000 WL 1264285, at *11 n.30 (S.D.N.Y. Sept. 5, 2000).

[10] *Merco Properties* also indicates that corporations cannot be deprived of freedom of speech. "The Supreme Court has lately taken a more expansive view of the rights of artificial persons." *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 123 (2d Cir. 2017) (citing cases). However, those cases concern corporate speech, not the right of assembly.

The LLC likewise does not have standing to raise a challenge under the Fourteenth Amendment Privileges or Immunities Clause, which is asserted in Count Ten. *2dAC*, ¶ 75. The Supreme Court has long held that "[a] corporation . . . is not a 'citizen' within the meaning of the [Fourteenth Amendment] privileges and immunities clause." *Grosjean v. Am. Press Co.*, 297 U.S. 233, 244 (1936). Lastly, the LLC cannot bring the substantive due process claims referenced in Counts Ten and Twelve. "The liberty referred to in th[e] Fourteenth Amendment is the liberty of natural, not artificial, persons." *Nw. Nat. Life Ins. Co. v. Riggs*, 203 U.S. 243, 255 (1906); *see also Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1129–30 (7th Cir. 1995) (holding that corporations could not bring substantive due process claims).[11] The LLC's lack of standing precludes any comparable claims by the individual Plaintiffs to the extent their claims are business-related. *See Orion Wine Imports, LLC v. Applesmith*, 412 F. Supp. 3d 1174, 1186 (E.D. Cal. 2019) (plaintiff members of a LLC lacked standing under the Art. IV, § 2 Privileges and Immunities Clause to assert claims derivative of the LLC).[12]

The individual Plaintiffs have also failed to establish standing for their claims to the extent, if any, their First Amendment claims may be considered independent of the LLC. *See Amato*, 2020 WL 2542788, at *7 (drawing a distinction for standing purposes between Plaintiffs' First Amendment claims and other claims). This Court found that Plaintiffs' Original Complaint, "by itself, d[id] not allege adequate facts to support standing to pursue the[ir] First Amendment

---

[11] The Governor acknowledges that the Supreme Court has ruled in favor of corporations on substantive due process grounds without expressly addressing whether those corporations had standing to bring substantive due process claims. *See, e.g.*, *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 562–63 (1996). To the extent Plaintiffs' claims in this case can be understood, and in light of the Court's guidance in *Bellotti*, Plaintiffs' claims appear to be more analogous to the type of claims at issue in *Riggs* than those at issue in *Gore* and similar cases.

[12] The Seventh Circuit has surmised that associational standing principles may warrant a different result. *See W.C.M. Window Co. v. Bernardi*, 730 F.2d 486, 493 (7th Cir. 1984). That analysis is arguably *dictum* and—perhaps as a result—incorrectly conflates principles of business law with general principles of associational standing. In any event, the associational standing avenue would be unavailable to individual Plaintiffs in this case because *inter alia* one of the requirements of associational standing is that the individual plaintiffs "would otherwise have standing to sue in their own right." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). As was explained, individual Plaintiffs do not.

12

claims." *Amato*, 2020 WL 2542788, at *7. Even with the benefit of that guidance from the Court and opportunities to amend, the counseled Plaintiffs have pled no new facts that would support standing for their First Amendment claims.[13] That requires dismissal. *See id*.

## V.    Even if this Court Concludes it has Jurisdiction Over Plaintiffs' Claims, their Claims Lack Merit and this Court Should Dismiss Them

Plaintiffs acknowledge that a "Coronavirus crisis . . . began to take hold in Connecticut" in March 2020. *2dAC*, ¶ 13. On March 20, 2020, 14 days before Plaintiffs filed this action, the Second Circuit issued a unanimous opinion in which the Court bleakly noted that "[a]s we write this opinion, a . . . dramatic challenge is presented by COVID-19, a novel and easily transmitted viral disease [resulting from exposure to coronavirus] that has prompted a rapid reorientation of workplace practices and social life in support of public health." *Fed. Defs.*, 954 F.3d at 135. The court noted that "the impact of this recent emergency" was "just beginning to be felt" and that "[i]ts likely course we cannot foresee." *Id*. However, the court observed that "[p]resent information strongly suggests . . . that it may be grave and enduring." *Id.*

That has unfortunately proven to be true. As a result of COVID-19, the Governor—like every other Governor in the United States (and leaders world-wide)—has been forced to make extraordinarily difficult decisions based on constantly evolving information. As the Governor argued and this Court recognized earlier in this case, the United States Constitution makes clear that those decisions are primarily the Governor's to make and the Supreme Court has "mandated judicial deference in such situations." *Amato*, 2020 WL 2542788, at *9 (referencing *Jacobson*).

Plaintiffs' counsel has indicated in press statements related to this case that he believes *Jacobson* is outdated. *See News Articles* (A-46). But this Court has already found "that the

---

[13] Plaintiffs added paragraphs 23 to 28 in an apparent effort to correct their failure to plead facts indicating that they would have reopened in April but for the Orders. Those facts do nothing to correct the standing defects this Court identified as to Plaintiffs' First Amendment claims.

standard articulated in *Jacobson* applies here; [t]he decision has never been overturned, and the Second Circuit relied on the *Jacobson* standard in 2015 in *Phillips*." *Amato*, 2020 WL 2542788, at *10 (citing *Phillips v. City of New York*, 775 F.3d 538, 542 (2d Cir. 2015)). This Court's finding was consistent with the "chorus of other federal courts" that have "point[ed] to *Jacobson* and reject[ed] similar constitutional claims brought by Plaintiffs challenging similar COVID-19 restrictions in other states." *Open Our Oregon v. Brown*, 2020 WL 2542861, at *2 (D. Or. May 19, 2020) (citing eleven cases from other Circuit and district courts, including *Geller v. De Blasio*, 2020 WL 2520711 (S.D.N.Y. May 18, 2020)). Indeed, multiple Circuit courts have issued extraordinary writs of mandamus because district courts failed to properly apply *Jacobson*'s deferential standard to state health orders issued in response to COVID-19. *See In re Rutledge,* 956 F.3d 1018, 1032 (8th Cir. 2020) (granting a writ of mandamus, and noting that "[o]ur conclusion is supported by our concern that the district court committed a serious error in failing to meaningfully apply the *Jacobson* framework, which resulted in a clear abuse of discretion"); *In re Abbott*, 954 F.3d 772, 795 (5th Cir. 2020) (similar).

Perhaps most fundamentally, the Supreme Court recently validated this Court's finding that *Jacobson* controls. In *S. Bay*, the Supreme Court denied an application for injunctive relief directed at a Governor's COVID-19 Orders. *S. Bay*, 140 S. Ct. at 1613. In his concurrence, Chief Justice Roberts expressly relied on *Jacobson* and its holding that "[o]ur Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'" *Id*. (Roberts, C.J., concurring in denial of application for injunctive relief) (quoting *Jacobson*, 197 U.S. at 38). No Justice expressed any doubt that *Jacobson* remains good law; even the dissenting Justices agreed that "[t]he State . . . has

14

substantial room to draw lines, especially in an emergency." *Id*. at 1615 (Kavanaugh, J., joined by Thomas, J., and Gorsuch, J., dissenting from denial of application for injunctive relief).

This Court has already correctly found that Plaintiffs' First Amendment association and assembly claims would fail even under traditional First Amendment analysis. *Amato*, 2020 WL 2542788, at *11-13. Even with the benefit of that guidance, Plaintiffs' Second Amended Complaint does nothing to cure the defects this Court identified. *See id*. That should warrant dismissal of Plaintiffs' claims in Counts Eight and Nine, even without reliance on *Jacobson*.

In any event, *Jacobson* removes any doubt that this Court should dismiss all of Plaintiffs' claims against the Governor in their entirety. "*Jacobson* requires that courts refrain from second-guessing state governments' responses [to COVID-19] unless there is 'no real or substantial relation' between the actions and the public health and safety or the action is 'beyond all question, a plain, palpable invasion of rights.'" *Amato*, 2020 WL 2542788, at *10 (quoting *Jacobson*, 197 U.S. at 31). As Chief Justice Roberts recently put it, when state "officials 'undertake[ ] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.'" *S. Bay*, 140 S. Ct. at 1613 (Roberts, C.J., concurring in denial of application for injunctive relief) (quoting *Marshall v. United States*, 414 U.S. 417, 427 (1974)). "Where those broad limits are not exceeded, they should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people." *Id*. at 1613-14 (quoting *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 545 (1985)).

The Governor's actions were well within the especially broad latitude the United States Constitution granted him to take action "to limit the spread of COVID–19, a novel severe acute respiratory illness that has killed thousands of people in [Connecticut] and more than 100,000

nationwide" and for which "[a]t this time, there is no known cure, no effective treatment, and no vaccine." *Id*. at 1613. Plaintiffs' claims lack any merit and this Court should dismiss them.

### A.  Plaintiffs' Right of Assembly Claims in Count Eight Lack Merit

Count Eight alleges violations of the right of assembly under the First Amendment. *2dAC*, at ¶¶ 64-66. In examining these claims in the context of Plaintiffs' Original Complaint, this Court found that they were not likely to succeed both because "*Jacobson* establishes that states may institute extraordinary measures to protect public health" and because, "even if *Jacobson* did not apply, the Plaintiffs' arguments are unlikely to succeed under traditional First Amendment analysis." *Amato*, 2020 WL 2542788, at *9 (quotation marks omitted).

Plaintiffs' Second Amended Complaint makes no changes that would even arguably remedy those defects in Plaintiffs' claims. Specifically, Plaintiffs still do not make any non-conclusory factual allegations in support of their assembly claims, and that warrants dismissal. To survive a motion to dismiss, a Complaint must contain "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (quotation marks omitted). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id*. (quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Id.* (quotation marks omitted).

Naked assertions are still all Plaintiffs offer here; they allege only that the Governor issued an Order "banning all gatherings of people that exceeded five[14] in number, except for religious and social gatherings," *2dAC*, ¶ 22, and that it was an "unconstitutional restriction[ ] on

---

[14] Of course, Plaintiffs' assembly claims are even weaker to the extent Plaintiffs seek prospective declaratory or injunctive relief. The five person limit Plaintiffs reference in their Second Amended Complaint is no longer operative, and has been replaced with a 25 person indoor limit and a 100 person outdoor limit. (A-28). Plaintiffs have asserted no facts to indicate that those limits would in any way impair their right to assemble. *See, e.g.*, *Am. Steel Foundries v. Tri-City Cent. Trades Council*, 257 U.S. 184, 201 (1921) ("[B]ecause relief by injunction operates *in futuro* . . . the right to it must be determined as of the time of the hearing.").

the Plaintiffs' liberty and right to assemble under the First Amendment . . . because it is neither necessary nor carefully tailored to address the purported public health need." *Id.* at ¶ 65. Those allegations are insufficient to survive this Motion to Dismiss.

Given the paucity of factual allegations, it is difficult for the Governor to ascertain what Plaintiffs intend their assembly claim to be. No matter how it is construed, there is no evident reason to believe it can survive this Motion to Dismiss.

*Jacobson* indicated *inter alia* that to avoid the spread of disease apparently healthy individuals could be held "held in quarantine against [their] will on board" a ship with "cases of" a disease "until it be ascertained by inspection, conducted with due diligence, that the danger of the spread of the disease among the community at large has disappeared." *Jacobson*, 197 U.S. at 29. That is surely more of an infringement on the right to assemble than anything that is either alleged in Plaintiffs' Complaint, or could somehow be divined from it. And even after this Court has given Plaintiffs opportunities to amend Plaintiffs do not even allege that the Governor's Order is unconstitutional under the *Jacobson* standard. *Id.* at 28, 31.

Instead, Plaintiffs disregard the existence of the pandemic and allege that the Order is unconstitutional "because it is neither necessary nor carefully tailored to address the purported public health need." *2dAC*, ¶ 65. That is the incorrect standard and this Court should dismiss Plaintiffs' claims on that basis alone. *Cf. In re Abbott*, 954 F.3d at 783 (granting a writ of mandamus where the district court failed to apply (or even acknowledge) *Jacobson*). This Court correctly recognized that the Supreme Court has made clear that *Jacobson* applies in the First Amendment context. *Amato*, 2020 WL 2542788, at *10. Plaintiffs do not even allege that the Order is unconstitutional under the applicable *Jacobson* standard, let alone facts that would support such a conclusion. *See id.* at *9-11 (analyzing Plaintiffs' functionally identical assembly

claims in their Original Complaint under the *Jacobson* standard and holding that they did not have a likelihood of success on the merits).

But Plaintiffs' assembly claims would be subject to dismissal even under Plaintiffs' own inapplicable standard from traditional First Amendment analysis. *See id.* at *11-12. The challenged "restrictions are content neutral," and their "application to *all* social and recreational gatherings makes clear that the limitation has nothing to do with the expressive content of any such gatherings." *Id.* at *11 (emphasis in *Amato*). The restrictions are also "'narrowly tailored to serve a significant governmental interest, and [they] leave[ ] open ample alternative channels for communication.'" *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). The Supreme Court has made clear that the state has a significant interest in limiting the spread of disease, the challenged restrictions are narrowly tailored to further that interest, and they "leave[ ] open alternative channels of expression." *Id.* That would be fatal to Plaintiffs' claims, even under the "stricter First Amendment analysis" that would apply if Connecticut were not in the midst of a deadly pandemic. *Id.* at *12; *see also McCarthy v. Cuomo*, 2020 WL 3286530, at *4 (E.D.N.Y. June 18, 2020) (reaching a similar conclusion in challenge to a COVID-19 Order).

Those defects—which Plaintiffs were unwilling or unable to correct—should be more than enough to warrant dismissal, but Plaintiffs' assembly claims are defective in other ways. To allege an assembly claim that could even theoretically survive this Motion to Dismiss, Plaintiffs needed to provide sufficient plausible factual assertions as to when and where they wanted to assemble, with whom, and for what purpose. *See, e.g.*, *Cox v. State of La.*, 379 U.S. 536, 554 (1965) ("The rights of free speech and assembly, while fundamental in our democratic society, still do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time."); *Johnson v. Perry*, 859 F.3d 156, 171–72 (2d Cir. 2017) (noting

that the analysis of assembly claims depends in part on the location of the assembly); *A.B.C. Home Furnishings, Inc. v. Town of E. Hampton*, 947 F. Supp. 635, 643 (E.D.N.Y. 1996) (dismissing an assembly claim where it was based on a government's "efforts to control the plaintiff's commercial enterprise"). "[T]he First Amendment protects conduct only if it has an expressive purpose," and this Court should independently dismiss Plaintiffs' assembly claims because Plaintiffs "do[ ] not allege" that they were "engaged in any expressive conduct" impacted by the Orders. *Salmon v. Blesser*, 802 F.3d 249, 256 (2d Cir. 2015) (affirming dismissal of assembly claims for failure to state a claim); *see also Best Supplement Guide, LLC v. Newsom*, 2020 WL 2615022, at *4 (E.D. Cal. May 22, 2020) (holding that an assembly challenge to a Governor's COVID-19 order was not likely to succeed where the plaintiffs' claims were based on "non-expressive, commercial interaction").

## B. Plaintiffs' Right of Freedom of Association Claims in Count Nine Lack Merit

Count Nine alleges violations of the right of freedom of association under the First, Ninth[15], and Fourteenth Amendments. *2dAC*, at ¶¶ 67-73. This Court should dismiss Plaintiffs' association claims for reasons similar to the reasons it should dismiss Plaintiffs' assembly claims.

Again, Plaintiffs apply the incorrect standard, this time alleging that the Order is unconstitutional because it "poses a substantial and undue burden on the Plaintiffs' liberty and right to freely associate with their customers and their friends." *Id.* at ¶ 68. *Jacobson* provides the correct standard, and indicated that restrictions on associational rights far more substantial than anything Plaintiffs allege would be constitutionally permissible in emergency circumstances such

---

[15] Plaintiffs' reliance on the Ninth Amendment adds nothing to their claims; "'[t]he Ninth Amendment is not an independent source of individual rights.'" *Phillips*, 775 F.3d at 544 (quoting *Jenkins v. C.I.R.*, 483 F.3d 90, 92 (2d Cir. 2007)).

as these. *Jacobson*, 197 U.S. at 29 (indicating that apparently healthy individuals could be quarantined on a ship with others with a disease against their will); *see also Amato*, 2020 WL 2542788, at \*10 (applying *Jacobson* to a First Amendment claim). Indeed, since *Jacobson*, the Supreme Court has indicated that associational rights are "among the rights least compatible" with a state's sometimes legitimate needs to limit otherwise permissible conduct and that a state's curtailment of associational rights is given deferential review, even outside the emergency context. *Overton v. Bazzetta*, 539 U.S. 126, 131–32 (2003); *see also Muhammad v. Annucci*, 2020 WL 264104, at \*4 (S.D.N.Y. Jan. 17, 2020), *report and recommendation adopted*, 2020 WL 1303571 (S.D.N.Y. Mar. 19, 2020) (reading *Overton* as "questioning whether the First Amendment right to association extends even to familial visits to inmates"). Plaintiffs do not even allege that the Orders are unconstitutional under the applicable standard (let alone facts to support that assertion) and that alone would be sufficient grounds for dismissal. This Court said it "would find that Executive Order 7N was a reasonable state action under *Jacobson*," based on Plaintiffs' Original Complaint. *Amato*, 2020 WL 2542788, at \*13. Plaintiffs' Second Amended Complaint does nothing to change that result. This Court can dismiss Plaintiffs' association claims without any further analysis.

That said, Plaintiffs' association claims would be subject to dismissal even under Plaintiffs' own inapplicable standard. *See id*. at \*12-13 (analyzing Plaintiffs' claims in their Original Complaint under both *Jacobson* analysis and "traditional First Amendment analysis"). "The right to associate freely is not mentioned in the text of the First Amendment, but has been derived over time as implicit in and supportive of the rights identified in that amendment." *Jacoby & Meyers, LLP v. Presiding Justices*, 852 F.3d 178, 185 (2d Cir. 2017). The First Amendment freedom of association "has been generally understood to encompass two quite

different types of associational activity: 'choices to enter into and maintain certain intimate human relationships,' and 'associat[ion] for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion.'" *Id*. (quoting *Roberts*, 468 U.S. at 617).

Plaintiffs do not allege facts that would plausibly assert a claim under either category. Plaintiffs do not allege any fact that would indicate the Orders prevented them from associating with anyone for purposes of protected activity. *See id*.; *see also Amato*, 2020 WL 2542788, at *13 (noting that Plaintiffs' association claims in their functionally identical Original Complaint were not likely to succeed on their merits because Plaintiffs "have not alleged" any facts "regarding the purpose of their association"). "It is Plaintiffs' burden to show that gathering with th[eir customers and friends] is constitutionally protected, and they have failed to do so" even after this Court has given them multiple opportunities. *Amato*, 2020 WL 2542788, at *12.

The closest Plaintiffs come to the "intimate human relationships" category is their assertions that the Orders "pose[ ] a substantial and undue burden on the Plaintiffs' liberty and right to freely associate with their customers and her friends." *Id*. at ¶ 68. It appears from the allegations that the individual Plaintiffs consider their customers their friends, but Plaintiffs' claims would fail even if customers and friends are two separate categories of people.

Either way, "non-familial relationships generally do not receive First Amendment protection." *Maselli v. Tuckahoe Union Free Sch. Dist.*, 2019 WL 3456581, at *4 (S.D.N.Y. July 31, 2019) (citing cases). "'The right generally will not apply, for example, to business relationships.'" *Id*. (quoting *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 996 (2d Cir. 1997)). Indeed, "the Second Circuit has specifically held that the relationships between a restaurant owner and her customers or employees are not protected by the First

21

Amendment." *Amato*, 2020 WL 2542788, at *12 (citing *Michaelidis v. Berry*, 502 F. App'x 94, 96–97 (2d Cir. 2012) (Summary Order)). Even after this Court made clear that Plaintiffs needed to allege facts to support their association claims and gave counseled Plaintiffs opportunities to do so, Plaintiffs still "fail to allege or aver any facts suggesting that their relationships with 'friends' . . . are sufficiently intimate to implicate the First Amendment." *Id.* (citing cases, including *Gross v. City of Albany*, 2015 WL 5708445, at *10 (N.D.N.Y. Sept. 29, 2015), which held that "friendships, however close, are insufficient to state a claim under the First Amendment" (quotation marks omitted)).

"At the motion to dismiss stage," the "assessment" of whether a given relationship is constitutionally protected "is necessarily premised upon the description of the relationship in the operative pleadings." *Id.* (quotation marks omitted). Plaintiffs fall far short of making the necessary allegations to support an association claim sufficient to withstand this Motion to Dismiss. *See id.* (citing *Maselli*, which "collect[ed] Second Circuit cases on the freedom of association and "declin[ed] to hold, on the non-specific facts alleged in the [complaint], that Plaintiff's relationship with [her brother-in-law] is entitled to First Amendment protection" despite far more detailed factual allegations than Plaintiffs offer here (quotation marks omitted)).

The Court's analysis need proceed no further, but Plaintiffs' association claims should also fail for the independent reason that—even if we were not in an emergency situation—the Orders, at most, limit Plaintiffs on the margins. "Though such inhibiting conduct might make it more difficult for individuals to exercise their freedom of association, this consequence does not, without more, result in a violation of the First Amendment." *Fighting Finest, Inc. v. Bratton*, 95 F.3d 224, 228 (2d Cir. 1996). Rather, "[t]o be cognizable, the interference with associational

rights must be 'direct and substantial' or 'significant.'" *Id*. (quoting *Lyng v. UAW*, 485 U.S. 360, 367 & n.5 (1988)).

Plaintiffs' allegations do not approach that showing. Plaintiffs acknowledge—as they must—that the challenged Orders applied only to "gatherings of people that exceed[ ] five in number" and had exceptions "for religious and social gatherings." *2dAC*, ¶ 22. Plaintiffs fail to allege that the challenged Orders "otherwise prohibit alternative means of communication or virtual gathering." *Friends of Danny DeVito v. Wolf*, 227 A.3d 872, 902–03 (Pa.), *petition for cert. filed*, No. 19-1265 (2020) (upholding Executive Order issued in response to this pandemic against association challenge); *see also Six v. Newsom*, 2020 WL 2896543, at *7 (C.D. Cal. May 22, 2020) (finding that an association challenge to a Governor's COVID-19 Order was not likely to succeed where the plaintiffs could still associate through other means, including "virtual platforms" and that a plaintiffs' professed desire to perform in front of crowds did not fall "under the right to intimate association"). Plaintiffs fail to state an association claim on which relief may be granted and this Court should dismiss Count Nine.

### C.  Plaintiffs' Honest Living Claims in Count Ten Lack Merit

Count Ten alleges violations of Plaintiffs' purported constitutional rights to pursue an honest living under the Fourteenth Amendment to the United States Constitution's Privileges or Immunities and Due Process Clauses. *2dAC*, at ¶¶ 74-77. As Plaintiffs' counsel has recognized elsewhere (A-52), Supreme Court precedent has precluded the Privileges or Immunities portion of Plaintiffs' claims for well over a century, even outside the context of a pandemic. *See The Slaughter–House Cases*, 83 U.S. 36 (1872); *see also McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 758 (2010) ("declin[ing] to disturb the *Slaughter–House* holding").

23

As the Fourth Circuit pointed out in rejecting a claim similar to Plaintiffs' as "foreclosed" by Supreme Court precedent, in *The Slaughter-House Cases* the Supreme Court "confined the reach of" the Fourteenth Amendment's Privileges or Immunities Clause "to a set of national rights that does not include the right to pursue a particular occupation." *Colon Health Centers of Am., LLC v. Hazel*, 733 F.3d 535, 548 (4th Cir. 2013). The Fourth Circuit found that it "lack[ed] the authority to disturb" the Supreme Court's decision. *Id*. at 548-49. "This is especially the case where recognition of an unenumerated substantive right would open the door to a host of textually dubious challenges to state economic regulation of every sort." *Id*. at 549.

The substantive due process[16] aspect of Plaintiffs' honest living claims likewise should not survive dismissal.  *2dAC*, at ¶ 76. As a threshold matter, Plaintiffs' substantive due process claims in this Count or elsewhere in their Complaint necessarily fail to the extent they are based on conduct that forms the basis for alleged violations of other more specific constitutional provisions. *See, e.g.*, *Velez v. Levy*, 401 F.3d 75, 94 (2d Cir. 2005). Plaintiffs' substantive due process claims would also fail in insolation. "'The first step in substantive due process analysis is to identify the constitutional right at stake,' then the court must 'consider whether the state action . . . was arbitrary in the constitutional sense and therefore violative of substantive due process.'" *Nicholson v. Hannah*, 2020 WL 3086022, at *4 (D. Conn. June 10, 2020) (Meyer, J.) (quoting *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994)).

Plaintiffs' claims fail at both steps. As to the first step, Plaintiffs claim a violation of their "right to pursue an honest living."  *2dAC*, at ¶ 76. No such federal constitutional right exists. *See Richardson v. Clackamas Cty.*, 2014 WL 1653064, at *2 (D. Or. Apr. 24, 2014) (finding that the rights protected by the Constitution "do not include . . . the right to an honest living"). That alone

---

[16] Although the counseled Plaintiffs' Second Amended Complaint does not specify whether their due process claims are substantive or procedural, the language used indicates that Plaintiffs' claims are substantive and Plaintiffs' Second Amended Complaint alleges no facts that give even a theoretical basis for a procedural due process claim.

warrants dismissal of Plaintiffs' claim at the first step of the substantive due process analysis. *See, e.g.*, *Washington v. Sessions*, 2018 WL 1114758, at *9 (S.D.N.Y. Feb. 26, 2018), *appeal held in abeyance sub nom. Washington v. Barr*, 925 F.3d 109 (2d Cir. 2019) (dismissing a substantive due process claim without further analysis where the claimed right did not exist).

Even if Plaintiffs had plead a recognized right, their substantive due process claims would be subject to dismissal at the second step of the analysis because Plaintiffs have not pled—and could not credibly plead—facts to support a conclusion that the Governor's actions were "'arbitrary in the constitutional sense and therefore violative of substantive due process.'" *Nicholson*, 2020 WL 3086022, at *4 (quoting *Lowrance*, 20 F.3d at 537). "Rules of due process are not . . . subject to mechanical application in unfamiliar territory." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998). Official conduct "that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Id*. In performing that analysis, "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Id.* at 846. "[L]iability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Id*. at 849. "It is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Id*.

This Court has found, and Plaintiffs have rightly acknowledged[17], that "governments certainly have a significant interest in protecting public health and in limiting the spread of

---

[17] *See, e.g.*, *MIS TRO/PI Motion*, p. 16 (ECF No. 11-1) (acknowledging that "there is an undeniable public interest in combatting and containing coronavirus").

disease." *Amato*, 2020 WL 2542788, at *11. Plaintiffs allege no facts indicating that the Orders were "intended to injure" or that they were "unjustifiable by" the state's interest in limiting the spread of COVID-19. *Lewis*, 523 U.S. at 849. To the contrary, Plaintiffs explicitly acknowledge that closing their business was "the best course of action for their business, their employees, and the community they served" in mid-March, *2dAC*, at ¶ 13, "to help flatten the curve of the coronavirus outbreak despite the fact that, at that time, gatherings of fifty people were still allowed" under the Orders. *Id*. at ¶ 14. Thus, Plaintiffs admit that business closures can be—and once were—justified in furtherance of the state's admitted interest in preventing the spread of COVID-19; the only issue is when and how those closures should be lifted.

Plaintiffs plead no facts that would remotely support a claim that the Governor's actions in connection with modifying his Orders in response to changes in the pandemic were so unjustified as to become constitutionally arbitrary. "The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement." *S. Bay*, 140 S. Ct. at 1613 (Roberts, C.J., concurring in denial of application for injunctive relief). As the primary protector of people in Connecticut from COVID-19, the Governor was compelled "'to act in areas fraught with medical and scientific uncertainties,'" and the Constitution granted—and grants—him "'especially broad'" latitude to act without the "second-guessing" by the courts that would follow from substantive due process liability. *Id*. (quoting *Marshall*, 414 U.S. 417, 427).

The Second Circuit has made clear that Plaintiffs' concession of a legitimate government interest and Plaintiffs' failure to allege any facts supporting a finding of bad faith should be fatal to Plaintiffs' substantive due process claims. *See, e.g.*, *Lombardi v. Whitman*, 485 F.3d 73, 82–83 (2d Cir. 2007). In *Whitman*, the Court rejected substantive due process claims brought by

plaintiffs who "performed search, rescue and clean-up work at the World Trade Center site . . . in the aftermath of the September 2001 terrorist attacks" and who alleged that "federal officials, issued reassuring—and knowingly false—announcements about the air quality in lower Manhattan," which led the plaintiffs "to work at the site without needed respiratory protection" and resulted in harm to their health. *Id*. at 74. In so holding, the Court reasoned that "the complaint's allegations d[id] not shock the conscience even if the defendants acted with deliberate indifference: when agency officials decide how to reconcile competing governmental obligations in the face of disaster, only an intent to cause harm arbitrarily can shock the conscience in a way that justifies constitutional liability." *Id*. at 74-75.

The Second Circuit's logic in *Whitman* applies with even greater force here. In contrast to Plaintiffs in this case, the plaintiffs in *Whitman* had an undisputed substantive due process right to bodily integrity that the defendants' alleged conduct implicated. *Id*. at 79. Even so, the Second Circuit held that the defendants' allegedly knowingly false statements did not shock the conscience for substantive due process purposes. That was because "[t]he conscience recognizes the dilemma of conflicting obligations. In the apparent absence of harmless options at the time decisions must be made, an attempt to choose the least of evils is not itself shocking." *Id*. at 82.

The *Whitman* defendants had to balance the plaintiffs' safety against the "essential government function in the wake of disaster . . . to put the affected community on a normal footing, *i.e.*, to avoid panic, keep order, restore services, repair infrastructure, and preserve the economy." *Id*. at 83. Under those circumstances, "the allocation of risk may be a burden on the conscience of the one who must make such decisions, but does not shock the contemporary conscience" for substantive due process purposes. *Id*. at 85.

The same is true here. "[I]n the § 1983 context, courts should operate from a

27

'presumption that the administration of government programs is based on a rational decisionmaking process that takes account of competing social, political, and economic forces.'" *Id*. at 84 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992)). The Governor was faced with a "dramatic challenge" that is "presented by COVID-19, a novel and easily transmitted viral disease that has prompted a rapid reorientation of workplace practices and social life in support of public health." *Fed. Defs.*, 954 F.3d at 126. Under such circumstances, "substantive due process liability should not be allowed to inhibit or control policy decisions of government agencies, even if some decisions could be made to seem gravely erroneous in retrospect." *Whitman*, 485 F.3d at 84.

To be clear, Plaintiffs do not—and could not credibly—allege facts that would support a conclusion that the Governor's decisions were either gravely erroneous or constitutionally arbitrary. Rather, Plaintiffs admit that Connecticut faced a "crisis" and that closing their business was an appropriate response to that crisis. *2dAC*, at ¶¶ 13-14. Plaintiffs nonetheless want this Court to "second-guess[ ]" the Governor's response to "COVID–19, a novel severe acute respiratory illness," with which people "may unwittingly infect others," and for which "there is no known cure, no effective treatment, and no vaccine." *S. Bay*, 140 S. Ct. at 1613 (Roberts, C.J., concurring in denial of application for injunctive relief). Substantive due process is not a proper constitutional vehicle for such second-guessing and this Court should dismiss Plaintiffs' claims.

### D.  Plaintiffs' Fifth Amendment Taking Claims in Count Eleven Lack Merit

The Fifth Amendment is the only federal constitutional provision Plaintiffs reference as a basis for their taking claims in Count Eleven. *2dAC*, ¶¶ 78-80. Supreme Court precedent forecloses Count Eleven as pleaded. Well over a century ago, the Court found that "[t]here is no specific prohibition in the federal constitution which acts upon the states in regard to their taking

private property for any but a public use." *Fallbrook Irr. Dist. v. Bradley*, 164 U.S. 112, 158 (1896). Importantly for present purposes, the Court held that "[t]he fifth amendment, which provides, among other things, that . . . property shall not be taken for public use without just compensation, applies only to the federal government, as has many times been decided." *Id*. That remains the law as to the Fifth Amendment.[18]

When a *pro se* plaintiff relies on the Fifth Amendment as the basis for a takings claim against state officials, courts sometimes construe the plaintiff's "reliance on the Fifth Amendment . . . as an invocation of the Fourteenth Amendment, because the latter applies to due process violations or takings by state rather than federal actors and [the p]laintiffs have not alleged any wrongdoing by federal actors." *Sibiski v. Cuomo*, 2010 WL 3984706, at *8 (E.D.N.Y. Sept. 15, 2010) (quotation marks omitted). Here, however, Plaintiffs are counseled, and Count Twelve asserts a separate Fourteenth Amendment due process claim using identical operative language to Plaintiffs' Fifth Amendment taking claim in Count Eleven. *Compare 2dAC*, ¶ 79 (the operative paragraph for Plaintiffs' Fifth Amendment taking claim), *with id*. at ¶ 82 (the operative paragraph for Plaintiffs' due process claim in Count Twelve). Therefore, this Court should dismiss Plaintiffs' Fifth Amendment taking claim. *See Bradley*, 164 U.S. at 158.

### E. Plaintiffs' Due Process Claims in Count Twelve Lack Merit

Count Twelve alleges that the Governor's actions deprived "Plaintiffs of their property without due process of law," *2dAC*, ¶ 83, because the Governor's Orders regulate "the use of private property to such a degree that it effectively deprives the Plaintiffs of any economically

---

[18] The Supreme Court has never overruled this aspect of *Bradley*. The Court has used language since *Bradley* that—on its face—could be read as indicating that the Fifth Amendment "applies to the States as well as the Federal Government." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 306 n.1 (2002) ("*Tahoe-Sierra*") (citing *Chicago, B. & Q.R. Co. v. Chicago*, 166 U.S. 226, 239, 241 (1897) and *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 160 (1980)). However, the cases on which the *Tahoe-Sierra* Court relied make clear that the Court was indicating—consistent with *Bradley*—that the just compensation requirement "applies against the States through the Fourteenth Amendment." *Beckwith*, 449 U.S. at 160.

viable use of their property to the point where it deprives them of the value of their property." *Id.* at ¶ 82. Count Twelve uses identical operative language to Plaintiffs' taking claim in Count Eleven. Therefore, it appears that Plaintiffs intend Count Twelve to plead a regulatory taking claim under "[t]he Takings Clause of the Fifth Amendment[19]" as "[t]he clause applies to the states through the Fourteenth Amendment." *Elmsford Apartment Associates, LLC v. Cuomo*, 2020 WL 3498456, at *7 (S.D.N.Y. June 29, 2020) ("*Elmsford*").[20]

The "first step" in any due process claim—including one based on an alleged regulatory taking—is to "ask whether the claimant has a cognizable property interest that has been jeopardized by governmental action." *Ganci v. New York City Transit Auth.*, 420 F. Supp. 2d 190, 196 (S.D.N.Y.), *aff'd*, 163 F. App'x 7 (2d Cir. 2005). If not, the claimant has "failed to state a claim for which relief can be granted." *Id.* at 203.

Plaintiffs fail to define their claimed property interest with any specificity. To the extent the Governor can surmise Plaintiffs' claimed interest, it appears to be an interest in "the activities of business." *2dAC*, ¶ 82. That is not a protected interest for due process purposes; the Supreme Court has held that although a business' assets are property, "business in the sense of *the activity of doing business*, or *the activity of making a profit* is not property in the ordinary sense." *Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999) (emphasis in *Coll. Sav. Bank*). Therefore, Plaintiffs have not met their burden to identify a right protected by due process and this Court can—and should—dismiss Plaintiffs' claims on that

---

[19] To the extent Count Twelve could be construed as asserting any other type of substantive due process claim, any such claim should fail for the same reasons Plaintiffs' substantive due process claims in Count Ten should fail.

[20] To be clear, this Court need not—and should not—reach the merits of Plaintiffs' taking claims, whether they are under the Fifth Amendment or the Fourteenth. As discussed above, the Eleventh Amendment bars Plaintiffs' taking claims against the Governor in his official capacity. Those are the only takings claims available. *See Katsaros v. Serafino*, 2001 WL 789322, at *5 (D. Conn. Feb. 28, 2001) (Dorsey, J.) ("Only governmental entities, and not individuals, can be liable for takings violations."); *see also Bridge Aina Le'a, LLC v. State of Hawaii Land Use Comm'n*, 125 F. Supp. 3d 1051, 1078 (D. Haw. 2015), *aff'd sub nom.*, 950 F.3d 610 (9th Cir. 2020) ("A number of federal courts, among them the Fourth and Sixth Circuits, have also concluded that individual capacity defendants are not liable for federal takings claims." (citing cases)).

basis alone. *Local 342, Long Island Pub. Serv. Employees, UMD, ILA, AFL-CIO v. Town Bd. of Town of Huntington*, 31 F.3d 1191, 1194-95 (2d Cir. 1994) (dismissing due process claims where the plaintiff "demonstrated no protectible property interest").

Plaintiffs' regulatory taking claims would still be subject to dismissal even if Plaintiffs had alleged a protected interest for taking purposes.[21] The Supreme Court has applied the principle underlying *Jacobson* to taking claims. *United States v. Caltex*, 344 U.S. 149 (1952), is instructive. There, the Army destroyed oil companies' terminal facilities to deprive the Japanese of a "valuable logistic weapon" as they advanced following the attack on Pearl Harbor. *Id*. at 151. The Court of Claims initially granted the companies compensation for a constitutional taking. *Id*. The Supreme Court reversed, noting that "the common law had long recognized that in times of imminent peril—such as when fire threatened a whole community—the sovereign could, with immunity, destroy the property of a few that the property of many and the lives of many more could be saved." *Id*. at 154. The Court had previously applied that principle to deny recovery "to the owners of a factory which had been destroyed by American soldiers in the field in Cuba because it was thought that the structure housed the germs of a contagious disease." *Id*. (citing *Juragua Iron Co. v. United States*, 212 U.S. 297 (1909)). The Court had also applied it to actions taken by a state to limit the spread of disease outside the war context. *See Miller v. Schoene*, 276 U.S. 272, 277-81 (1928) (holding that the Constitution did not require the state to provide compensation to the owners of cedar trees that were ordered to be destroyed to prevent the spread of disease to apple trees).

---

[21] *Coll. Sav. Bank* establishes that Plaintiffs do not allege a due process protected interest. That should be fatal to their claims. To the extent Plaintiffs seek to rely on some other interest not identified in their Second Amended Complaint to support their taking claim, the Court should be cognizant that "'property' as used in" the taking context "is defined much more narrowly than in the due process" context for both historical and practical reasons. *Pittman v. Chicago Bd. of Educ.*, 64 F.3d 1098, 1104–05 (7th Cir. 1995) (Posner, J.). Recognizing a protected taking interest has significant constitutional consequences beyond those that attend due process interests. *See id*.

There is no question that the pandemic has made this a "time[ ] of imminent peril." *Caltex*, 344 U.S. at 154. The Supreme Court has made clear that the Governor has the authority to take action to protect the people in Connecticut from that peril without incurring constitutional taking liability. *See, e.g.*, *In re Abbott*, 954 F.3d at 784 (citing *Caltex* as an example of the *Jacobson* principle in the context of this pandemic). The Supreme Court has long held that "the mere fact that . . . regulation deprives the property owner of the most profitable use of his property is not necessarily enough to establish the owner's right to compensation." *United States v. Cent. Eureka Mining Co.*, 357 U.S. 155, 168 (1958). In the emergency context, the Court has "been reluctant to find that degree of regulation which, without saying so, requires compensation to be paid for resulting losses of income." *Id.* (in the context of war). "The reasons are plain." *Id.* Responding to an emergency of this scope "demands the strict regulation of nearly all resources" and makes "demands which otherwise would be insufferable." "But . . . economic restrictions, temporary in character, are insignificant when compared to the widespread uncompensated loss of life and freedom of action which" accompany this pandemic. *Id.*

This Court need not address any limits federal takings jurisprudence may place on the Governor's authority to respond to this pandemic because Plaintiffs' takings claims would fail even outside the emergency context. *Cf. Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 490–93 (1987) (holding that restraint of property use was justified under the *Miller* line of cases but also noting that "we need not rest our decision on this factor alone, because" the plaintiff's showing was insufficient under the ordinary test as well). Plaintiffs acknowledge that even before restrictions were recently loosened the Orders "allow[ed] restaurants and bars to sell alcohol for off premises consumption provided that it was sold in a sealed container and that it accompanied an order of food," *2dAC*, ¶ 21, and Plaintiffs allege no facts indicating that—

despite that explicit allowance—the Orders "deprive[ Plaintiffs] of the value of their property" for takings purposes. *Id*. at ¶ 74. Nor is that conclusion evident. *See, e.g.*, *Murr v. Wisconsin*, 137 S. Ct. 1933, 1942 (2017) (holding that a categorical taking occurs only where a regulation "denies all economically beneficial or productive use of land"); *see also Wolf,* 227 A.3d at 893–96 (rejecting takings challenge to a Governor's Executive Order issued in response to this pandemic and citing cases, including *Nat'l Amusements Inc. v. Borough of Palmyra*, 716 F.3d 57 (3d Cir. 2013)). Takings law is "characterized by ad hoc, factual inquiries, designed to allow careful examination and weighing of all the relevant circumstances." *Murr*, 137 S. Ct. at 1942 (quotation marks omitted). Even after this Court has given them opportunities to amend, Plaintiffs still fall far short of asserting sufficient facts to survive this Motion to Dismiss.

## VI.    The Governor is Immune from Plaintiffs' Individual Capacity Claims for Damages

This Court should dismiss all of Plaintiffs' federal claims against the Governor for the reasons discussed above. If this Court disagrees in whole or in part, it should still dismiss Plaintiffs' individual capacity claims for damages. Supreme Court and Second Circuit precedent establishes that the Orders are considered legislative acts for immunity purposes and that the Governor is absolutely immune from damages claims as a result. In the alternative, qualified immunity protects the Governor from individual capacity damages liability given that he issued the challenged Orders in response to an admittedly unprecedented pandemic and there is no clearly established law even implying that the Orders exceeded the Governor's authority.

### A. Absolute Immunity Bars Plaintiffs' Claims Based on the Governor's Issuance of the Challenged Orders

Plaintiffs' claims against the Governor are based on generally-applicable Executive Orders the Governor issued in response to the pandemic, pursuant to authority granted him by the Connecticut General Assembly. *2dAC*, ¶¶ 19-22; *see also* Conn. Gen. Stat. § 19a-13la, *et*

*seq.*; Conn. Gen. Stat. § 28-9, *et seq.*[22] The United States Constitution grants federal legislators "absolute immunity from civil and criminal liability for conduct that falls 'within the sphere of legitimate legislative activity.'" *NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177, 190 (2d Cir. 2019) (quoting *Eastland v. U. S. Servicemen's Fund*, 421 U.S. 491, 503 (1975)). "The Supreme Court has determined that, under the common law, state and local government officials similarly enjoy absolute immunity against federal civil claims asserted against them in their individual capacities for equivalent legislative activity." *Id*. (citing *Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998)). The Court has held that immunity is necessary because "'the exercise of legislative discretion should not be inhibited by judicial interference or distorted by the fear of personal liability.'" *Id*. (quoting *Bogan*, 523 U.S. at 52).

The immunity "attaches to particular types of *conduct*, not to particular *job titles*." *Id*. at 191 (emphasis in the original). As a result, the Supreme Court has extended legislative immunity to executive officials (such as a mayor) and to a state supreme court, when it issued an attorney code of conduct. *See id*. (citing cases). "Analysis of the function at issue is therefore critical to a determination of whether legislative immunity will shield a defendant." *Id*.

The Second Circuit has adopted a two-factor test to determine whether an act is legislative and, therefore, accorded absolute immunity:

> First, it is relevant whether the defendants' actions were legislative in *form*, *i.e.*, whether they were integral steps in the legislative process. Second, it may also be relevant whether defendants' actions were legislative in *substance*, *i.e.*, whether the actions bore all the hallmarks of traditional legislation, including whether they reflected discretionary, policymaking decisions implicating the budgetary priorities of the government and the services the government provides to its constituents.

*NRP Holdings LLC*, 916 F.3d at 191–92 (quoting *State Emps. Bargaining Agent Coal. v.*

---

[22] Plaintiffs do not allege that the Governor exceeded his statutory authority under Connecticut law, nor would there be any basis for such an allegation.

*Rowland*, 494 F.3d 71, 89 (2d Cir. 2007) (emphasis in original)). The Governor's enactment of the Orders satisfies both prongs.

An act is procedurally legislative, i.e., legislative in form, if "passed by means of established legislative procedures." *Baraka v. McGreevey*, 481 F.3d 187, 198 (3d Cir. 2007) (internal quotation marks omitted). In other words, "constitutionally accepted procedures of enacting the legislation must be followed in order to assure that the act is a legitimate, reasoned decision representing the will of the people which the governing body has been chosen to serve." *Id.* (internal quotation marks omitted); *see also Rowland*, 494 F.3d at 89, 94 (citing *Baraka* with approval).

All of the Orders at issue in this case were enacted after the Governor declared public health and civil preparedness emergencies (A-20), through a process established by the General Assembly. Conn. Gen. Stat. §§ 28-9 and 19a-131a authorize the Governor to declare a state of civil preparedness emergency and a public health emergency respectively. The General Assembly may disapprove both declarations. Conn. Gen. Stat. § 28-9(a); Conn. Gen. Stat. § 19a-131a(b)(1).

The issuance of the Orders themselves was authorized by § 28-9. Subsection (b)(1) permits the Governor to:

> modify or suspend in whole or in part, by order as hereinafter provided, any statute, regulation or requirement or part thereof whenever the Governor finds such statute, regulation or requirement, or part thereof, is in conflict with the efficient and expeditious execution of civil preparedness functions or the protection of the public health.

Conn. Gen. Stat. § 28-9(b)(1). "Any such order shall have the full force and effect of law upon the filing of the full text of such order in the office of the Secretary of the State." *Id.* In addition, subsection (b)(7) grants the Governor the authority to "take such other steps as are reasonably

necessary in the light of the emergency to protect the health, safety and welfare of the people of the state . . . ." Conn. Gen. Stat. § 28-9(b)(7).

Thus, the General Assembly has provided a process by which the Governor can effectively enact legislation during a civil preparedness or public health emergency. Should the General Assembly disagree with an Order issued by the Governor under that authority, the General Assembly may disapprove it through the procedure established in subsection (a). Plainly, the Governor's enactment of the Orders was legislative in form or procedure. Not only were the Governor's Orders "integral steps on the legislative process," *NRP Holdings LLC*, 916 F.3d at 191, they were the legislative process as conceived by the General Assembly itself.

With respect to the second legislative immunity factor, acts are legislative in substance or "legislative in character" when they "involve policy-making decision [sic] of a general scope." *Baraka*, 481 F.3d at 198 (quotation marks omitted). "[T]o put it another way, legislation involves line drawing. Where the decision affects a small number or a single individual, the legislative power is not implicated, and the act takes on the nature of administration." *Id.* (quotation marks omitted); *compare Bogan*, 523 U.S. at 55–56 (finding ordinance legislative in nature because it "reflected a discretionary, policymaking decision implicating the budgetary priorities of the city and the services the city provides to its constituents"), *with Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 211 (2d Cir. 2003) (finding Board action not legislative in substance because the Board "did not engage in the kind of broad, prospective policymaking that is characteristic of legislative action").

The Orders at issue are quintessentially legislative in nature. They apply to every person in Connecticut and concern policy-making at the highest level—the State's coordinated response to a pandemic never before seen in our lifetimes based, in part, on the recommendations of the

United States Centers for Disease Control and the Connecticut Department of Public Health. Thus, the Orders satisfy the second prong of the legislative immunity test. Given the above, absolute immunity protects the Governor from any individual capacity damages claims based on his issuance of the Orders.

### B. Even if Absolute Immunity Did Not Bar Plaintiffs' Individual Capacity Damages Claims, Qualified Immunity Would

The Supreme Court has repeatedly recognized and reiterated that if absolute immunity is not available, for reasons "important to society as a whole" qualified immunity separately grants officials "immunity from suit" that "is effectively lost if a case is erroneously permitted to go to trial" and therefore should be decided as early in the case as possible. *White v. Pauly*, ___ U.S. ___, 137 S. Ct. 548, 551 (2017) (Per Curiam) (quotation marks omitted). Qualified immunity recognizes that "[f]or constitutional suits like this one to deter misconduct, without also deterring citizens from taking jobs in the public sector, [officials] must be able to understand the legal constraints on their conduct." *Moore v. Andreno*, 505 F.3d 203, 214 (2d Cir. 2007).

Consistent with that principle, in determining whether qualified immunity protects an official, "'[t]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Ziglar v. Abbasi*, ___ U.S. ___, 137 S. Ct. 1843, 1866 (2017) (quoting *Mullenix v. Luna*, 577 U.S. ____, 136 S. Ct. 305, 308 (2015) (Per Curiam) (emphasis in *Mullenix*)). For an official to lose immunity, "'in the light of pre-existing law,' the unlawfulness of the offic[ial]'s conduct 'must be apparent,'" *id*. at 1867 (quotation marks omitted), and "beyond debate." *Mullenix*, 136 S. Ct. at 308. Put differently, an official is immune from liability unless, under the particular circumstances the official faced, any "reasonable offic[ial]" would have "known for certain that the[ir] conduct was unlawful" under existing established precedent. *Ziglar*, 137 S. Ct. at 1867.

The Governor is clearly protected by, at least, qualified immunity here. There is no dispute that this pandemic is unprecedented and—as discussed above—Plaintiffs' claims have little, if any, support in the facts and the law. *Compl.*, ¶ 1.

There is absolutely no basis to conclude that any Governor in this Governor's shoes would have known for certain that it was beyond debate that the challenged Orders were unconstitutional. *See, e.g.*, *Ziglar*, 137 S. Ct. at 1867; *Mullenix*, 136 S. Ct. at 308; *see also Liberian Cmty. Ass'n of Connecticut v. Malloy*, 2017 WL 4897048, at *8-14 (D. Conn. Mar. 30, 2017) (Covello, J.) (appeal pending) (holding that qualified immunity barred individual capacity damages claims against the then-Commissioner of Public Health arising out of Ebola quarantines); *Hickox v. Christie*, 205 F. Supp. 3d 579, 588-603 (D. N.J. 2016) (holding that qualified immunity barred individual capacity damages claims against defendants including a Governor arising out of Ebola quarantine). The Governor is "deal[ing] in a terrible context . . . [where] the consequences of mistaken indulgence can be irretrievably tragic." *United States ex rel. Siegel v. Shinnick*, 219 F. Supp. 789, 790, 791 (E.D.N.Y. 1963). Qualified immunity should protect him from Plaintiffs' claims, which have no basis in either the law or the facts.

## VII.   The Court Should Decline to Exercise Supplemental Jurisdiction over Plaintiffs' State-Law Claims

This Court should decline to exercise supplemental jurisdiction over Plaintiffs' state constitutional claims to the extent, if any, Plaintiffs seek damages based on those claims and Plaintiffs' federal claims are dismissed.[23] "[A]s a general proposition . . . if [all] federal claims are dismissed *before trial* . . . the state claims should be dismissed as well." *Motorola Credit*

---

[23] As discussed above, the Supreme Court has made clear that this Court lacks jurisdiction over Plaintiffs' state constitutional claims to the extent they seek relief other than damages. *See, e.g.*, *Dennehy*, 2018 WL 4936003, at *2 (citing *Pennhurst*, 465 U.S. at 106).

*Corp. v. Uzan*, 388 F.3d 39, 56 (2d Cir. 2004) (emphasis in original) (internal quotation marks omitted).

The Second Circuit "has concluded that declining to exercise jurisdiction after all original-jurisdiction claims have been dismissed is especially appropriate where the pendent claims present novel or unsettled questions of state law." *Oneida Indian Nation of New York v. Madison Cty.*, 665 F.3d 408, 437 (2d Cir. 2011) ("*Oneida*"); *see also* 28 U.S.C. § 1367(c)(1). That is the case here.

Connecticut courts have not defined the parameters of the Connecticut Constitution in this pandemic, which poses unprecedented and important issues. For example, the Connecticut Supreme Court has held that not all violations of the Connecticut Constitution give rise to damages claims and has established a framework for determining when a damages remedy is available. *See Binette v. Sabo*, 244 Conn. 23 (1998). Connecticut courts have not recognized a *Binette* remedy in circumstances remotely analogous to these. Given that Plaintiffs may be "seeking to extend the narrow holding of *Binette* . . . well beyond the limits established by the Connecticut Supreme Court in that case, . . . any decision to so substantially extend Connecticut constitutional law in this manner should be made in the first instance by the courts of Connecticut, not a federal court." *Lopez v. Smiley*, 375 F. Supp. 2d 19, 23 (D. Conn. 2005) (Kravitz, J.). That weighs strongly against this Court exercising supplemental jurisdiction over Plaintiffs' state constitutional claims "(both those seeking monetary damages and those seeking injunctive or declaratory relief)." *Id*. at 26.

That is far from the only example of a novel and complex issue Plaintiffs' state constitutional claims would raise. If this Court concludes that Plaintiffs' federal claims should not proceed here, "federalism and comity concerns strongly suggest that" issues regarding the

state constitutional parameters of the Governor's pandemic response authority "should be determined on a case-by-case basis by *Connecticut courts* in the first instance." *Id*. at 26 (emphasis in *Lopez*). That is particularly true given that the United States Supreme Court has made clear that "[t]he safety and the health of the people of" a state "are, in the first instance, for that [state] to guard and protect." *Jacobson*, 197 U.S. at 38.

Although the argument against this Court exercising supplemental jurisdiction is strongest if this Court holds that all of Plaintiffs' federal claims against all Defendants should be dismissed, this Court can—and should—also decline to exercise supplemental jurisdiction over Plaintiffs' state claims to the extent they will "substantially predominate[ ] over" any federal claims that remain following motions to dismiss. 28 U.S.C. § 1367(c)(2); *see, e.g.*, *Cotterell v. Gen. Motors LLC*, 2019 WL 6894256, at *11 (D. Conn. Dec. 18, 2019) (Shea, J.) ("find[ing] that § 1367(c)(2) applie[d]"). Similarly, depending on the state of the claims following this Motion to Dismiss, this case may present "exceptional circumstances," where "there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c)(4); *see, e.g.*, *Oneida*, 665 F.3d at 437 (noting this provision). Ultimately, given the nature of these issues and the state's primary role in pandemic response, there are multiple reasons why this Court should decline to exercise supplemental jurisdiction or pendent party jurisdiction over Plaintiffs' state claims. *See, e.g.*, *Oneida*, 665 F.3d at 436-40 (applying multiple provisions and holding that supplemental jurisdiction over the plaintiff's state claims was not appropriate even though a federal claim remained).

## VIII.   Conclusion

For the reasons set forth above, the Governor respectfully requests that this Court dismiss Plaintiffs' claims against him in their entirety.

Respectfully submitted,

DEFENDANT

GOVERNOR NED LAMONT

WILLIAM TONG
ATTORNEY GENERAL

BY: */s/ Robert J. Deichert*
Robert J. Deichert (ct24956)
Philip Miller (ct25056)
Assistant Attorneys General
Attorney General's Office
165 Capitol Avenue
Hartford, CT 06106
860-808-5020 (phone)
860-808-5347 (fax)
Robert.Deichert@ct.gov
Philip.Miller@ct.gov
*Attorneys for the Governor*

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2020, a copy of the foregoing was electronically filed.

Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic

filing system.  Parties may access this filing through the Court's system.

*/s/ Robert J. Deichert*
Robert J. Deichert
Assistant Attorney General