**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

MICHAEL AMATO,                    :
JOY MONSANTO,                     :
50's LOUNGE, LLC,                 :        DKT No.: 3:20-cv-00464-MPS
                                  :
    Plaintiffs,           :
                                  :
v.                                :
                                  :
MAYOR JUSTIN ELICKER,             :
MAYOR'S REPRESENTATIVE,           :
GOVERNOR NED LAMONT               :
                                  :
    Defendants.           :        July 29, 2020

**MEMORANDUM OF LAW IN OPPOSITION TO GOVERNOR LAMONT'S MOTION TO**
**DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**

The Plaintiffs respectfully request[1] the Court to deny Governor Ned Lamont's

motion to dismiss their claims against him in its entirety, as the Defendant has asserted

that there is a "minimal factual and legal basis" for the Plaintiffs' claims, tacitly conceding

that such bases are neither insufficient nor implausible, as they must be in order for the

Court to dismiss at this stage of the litigation.

## I.    RELEVANT PROCEDURAL HISTORY

The Plaintiffs filed the instant action on April 3, 2020, and they moved for a

temporary restraining order and a preliminary injunction on April 10, 2020. *See* **Dkt. 1,**

**11**. On May 19, 2020, the Court issued a Ruling denying Plaintiffs' motion for a TRO. Dkt.

32. On that same day, Plaintiffs' filed their Amended Complaint. Dkt. 30.  Thereafter, on

June 17, 2020, the Plaintiffs filed their Second Amended Complaint in accordance with

---

[1] Oral argument not requested

the Court's Order issued on May 28, 2020, directing the Plaintiffs to file a second amended complaint in order to address the defects alleged in Mayor Elicker's memorandum of law in support of his motion to dismiss.  *See* Dkt. 34-1, 35, 41. Then, on July 8, 2020, the Governor filed his motion to dismiss the Plaintiff's Second Amended Complaint, to which the Plaintiffs now respond.  Dkt. 48.

## II.   <u>RELEVANT FACTS</u>

Beginning in early March 2020, Connecticut and its citizens began to struggle with twin crises: the spreading threat of COVID-19, and the fumbling, haphazard governmental response.  Between March 8, 2020-- when Governor Lamont announced the first positive case of COVID-19-- and March 16, 2020-- when Governor Lamont imposed Executive Order 7D-- the Plaintiffs, like all Connecticut residents, watched as the Governor and other municipal executives struggled to define and address the public health crisis with cascading orders based more on kneejerk reaction than sound science or local conditions.

Reluctant to simply rely upon the government, and concerned by its equivocal responses, the Plaintiffs voluntarily closed the doors of their business, the 50's Lounge, on March 15, 2020 as a temporary measure in order to assess for themselves the risks of the COVID-19 outbreak and evaluate how to safely operate going forward.  ECF No. 41, ¶ 23-24. Following research and deliberation, the Plaintiffs determined to reopen a week after closing, only to have that option foreclosed by the Governor's actions. *Id.* at 24-25. Despite subsequent changes to the Governor's orders, they remain arbitrary orders that impermissibly restrict constitutional rights without any appreciable basis in reason or science.

## III.   <u>LEGAL ARGUMENT</u>

Governor Lamont seeks dismissal of the Plaintiff's claims on the bases of lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) and failure to state a claim upon which relief can be granted under 12(b)(6). All of these bases fail as discussed hereinafter.

## IV.   <u>STANDARD</u>

The appropriate standard for a motion to dismiss for the lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1) is well-established. Because "[f]ederal courts are courts of limited jurisdiction…," *Gunn v. Minton*, 568 U.S. 251, 256 (2013), a court must dismiss an action if it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3). To decide a motion to dismiss for lack of subject matter jurisdiction, the district court "must take all uncontroverted facts in the complaint [] as true, and draw all reasonable inference in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014). If the facts pertaining to jurisdiction are disputed, 'the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings…." *Id*. "In that case, the party asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Id*.

In considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "the Court must accept as true all factual matter alleged in a complaint and draw all reasonable inferences in a plaintiff's favor." *Moore v. Connecticut Dept. of Correction*, 2015 WL 778626, at *2

(D. Conn. 2015) (citing *Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of New York Mellon*, 775 F.3d 154, 159 (2d Cir. 2014)). The Plaintiffs must allege "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).

## V.   THE ELEVENTH AMENDMENT DOES NOT BAR THE PLAINTIFF'S CLAIMS AGAINST GOVERNOR LAMONT IN HIS OFFICIAL CAPACITY.

### A. All Of The Plaintiffs' Claims At Law And Equity Are Not Barred By The Text Of The Eleventh Amendment And 42 U.S.C. § 1983.

All of Governor Lamont's Eleventh Amendment arguments fail as a textual matter. The Eleventh Amendment reads: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Consequently, the text of the Eleventh Amendment clearly requires diversity jurisdiction, which does not exist in the instant case, for the Eleventh Amendment's immunity to apply.

Although the U.S. Supreme Court rejected this strict textual interpretation of the Eleventh Amendment in *Hans v. Louisiana*, 134 U.S. 1 (1890) and many subsequent cases, *Hans*' rule does not control for several reasons. First, Eleventh Amendment immunity is not independently derived from the Eleventh Amendment. *Alden v. Maine*, 527 U.S. 706, 712-13 (1999). Instead, the Eleventh Amendment constitutionalized the common law sovereign immunity that states enjoyed before the ratification of the

4

*unamended* federal constitution. *Id.* "[I]n adopting the Fourteenth Amendment, the people required the States to surrender a portion of the sovereignty that had been preserved to them by the original Constitution."[2] *Id.* at 756. Consequently, even if the Eleventh Amendment constitutionalized common law sovereign immunity in an absolute fashion, the Fourteenth Amendment superseded it. Since the Supreme Court did not incorporate the Bill of Rights against the states until long after *Hans* was decided[3] and *Hans* itself concerned a claim under Art. I., § 10 of the federal constitution, it did not consider the Fourteenth Amendment's superseding effect. *See id.* generally. Since *Alden* recognizes the principle that the Fourteenth Amendment amends the Eleventh Amendment to abrogate a portion of state sovereign immunity, the Eleventh Amendment does not bar official capacity suits against state officials. Consequently, the Plaintiffs do not ask this Court to overrule the United States Supreme Court, but rather to logically apply its clear ruling in *Alden v. Maine* and hold that the Fourteenth Amendment supersedes Eleventh Amendment immunity.

Second, *Hans* does not control merely because the Supreme Court has not reconciled its jurisdictional authorization precedents with *Alden*.[4] Art. III, § 2 specifically states that the judicial power extends to "all cases, in law and equity, arising under this Constitution…." U.S. Const. Art. III, § 2. As an Article III court with general jurisdiction

---

[2] The *Alden* Court cited the past Supreme Court precedents on the bar against suing state officials in their official capacities, but it did not discuss them in detail because the issues were not properly before the Court. *Alden*, 527 U.S. at 756-57.

[3] The first clear instance of incorporation came in 1925 for the First Amendment in *Gitlow v. New York*, 268 U.S. 652 (1925).

[4] Prior to *Alden*, the Supreme Court repeatedly cited the Eleventh Amendment to reject requests to interpret 42 U.S.C. § 1983 as authorizing suits at law against state officials to proceed. *See, e.g.*,

over federal questions, the outer limits of this Court's jurisdiction over cases arising under the federal constitution does not flow from congressional authorization, but rather from Art. III, § 2, which authorizes it to hear *all* cases in *law* and equity. Since the Fourteenth Amendment has abrogated Eleventh Amendment sovereign immunity for claims under the Fourteenth Amendment as recognized by *Alden*, it naturally follows that Art. III, § 2 provides this Court with the subject matter jurisdiction to hear the instant case.

Third, even assuming that this Court requires congressional authorization to hear cases under the Fourteenth Amendment,[5] 42 U.S.C. § 1983 clearly abrogates Governor Lamont's Eleventh Amendment immunity.[6] § 1983 makes "[e]very person" liable for a violation of another person's constitutional rights. However, §1983 itself does not define the term person. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 77 (1989) (Brennan, J., dissenting). Consequently, "[a]ny analysis of the meaning of the word 'person' in § 1983 … must begin … with the Dictionary Act." *Id*. (quoting *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 719 (1978) (Rehnquist, J., dissenting)) (internal quotations omitted).

The Dictionary Act stated "[t]hat in all acts hereafter passed ... the word 'person' may extend and be applied to bodies politic and corporate ... unless the context shows that such words were intended to be used in a more limited sense...." Act of Feb. 25,

---

[5] *Alden* specifically recognized that Congress may abrogate a state's Eleventh Amendment immunity pursuant to its enforcement power under § 5 of the Fourteenth Amendment. *Alden,* 527 U.S. at 756 (citing *Fitzpatrick v. Bitzer*, 427 U.S. 445 (1976)).

[6] The Plaintiffs recognize that the U.S. Supreme Court has held otherwise in *Will v. Michigan Dept. of State Police*, 491 U.S. 58 (1989). Trusting that the Court will carefully and independently consider their arguments in accordance with its Art. VI, § 3 oath, the Plaintiffs also recognize that the Court may choose to follow its obligations under *stare decisis* and thus preserve this question for appeal.

1871, § 2, 16 Stat. 431. The Supreme Court held in *Monell* that this definition is "not merely allowable but mandatory, requiring that the word 'person' be construed to include 'bodies politic and corporate' unless the statute under consideration 'by its terms called for a deviation from this practice.'" *Monell*, 436 U.S. at 689, 690, n. 53. At the time that the Dictionary Act passed - two months prior to the passage of § 1983, "the phrase "bodies politic and corporate" was understood to include the States." *Will*, 491 U.S. at 78 (Brennan, J., dissenting) (compiling historical sources). Consequently, it is quite clear that Congress meant for the term persons in § 1983 to include states as required by the Dictionary Act.[7] Therefore, the Court has subject matter jurisdiction over all of the Plaintiffs' claims.

## B. The Fifth Amendment, As Incorporated Against The States Through The Fourteenth Amendment, Contains A Self-Executing Cause of Action That Supersedes The Eleventh Amendment.

The Fifth Amendment reads in relevant part as follows: "[N]or shall private property be taken for public use, without just compensation." The Supreme Court has consistently held since 1987 that the Fifth Amendment's Takings Clause is self-executing with respect to compensation. *Knick v. Township of Scott, Pennsylvania*, 139 S.Ct. 2162, 2171 (2019). Consequently, a property owner has a constitutionally authorized cause of action "for just compensation at the time of the taking." *Id.* "[B]ecause a taking without compensation violates the self-executing Fifth Amendment at the time of the taking, the property owner can bring a federal suit at that time." *Id.* at 2172.

---

[7] The Senate debates over the Dictionary Act confirm this interpretation. *See, e.g.*, Cong. Globe, 42nd Cong., 1st Sess., 661-662 (1871) (Sen. Vickers) ("What is a State? Is it not a body politic and corporate?"); *id.* at 696 (Sen. Edmunds) ("A State is a corporation").

*Knick* clearly indicates that the Fifth Amendment constitutionalizes a cause of action. Because the Fifth Amendment was incorporated against the states by the Fourteenth Amendment, it supersedes the Eleventh Amendment's sovereign immunity. Consequently, Count Eleven of the Plantiffs' complaint is not barred by the Eleventh Amendment.

### C. The Eleventh Amendment Does Not Bar Equitable Relief Under The *Ex Parte Young* Doctrine.

In *Ex Parte Young*, 209 U.S. 123 (1908), the Supreme Court held that the Eleventh Amendment does not bar plaintiffs from suing state officials for declaratory and injunctive relief. Governor Lamont does not dispute this principle as it applies to prospective equitable relief. However, he disputes it to the extent that the Plaintiffs seek retrospective equitable relief.

Governor Lamont's argument is litigiously cautious and thorough, but the Plaintiffs do not seek retrospective injunctive relief. Instead, the Plaintiffs seek only prospective injunctive relief over all of Governor Lamont's orders imposing restrictions on the claims in this suit if the Court declares his March 16, 2020 and March 26, 2020 orders unconstitutional.

To the extent that the Plaintiffs seek retrospective relief, they do so in their claims for damages as a matter of law, which would necessarily require a determination that Governor Lamont's orders were unconstitutional. As discussed above, the Eleventh Amendment does not bar such a determination.

### D. The Eleventh Amendment's Text And History Does Not Bar The Court From Exercising Pendent Jurisdiction Over The Plaintiffs' State Constitutional Claims.

The Plaintiffs are well aware of the Court's own rulings that have followed the Supreme Court's precedents holding that the Eleventh Amendment bars district courts from exercising pendent jurisdiction. *See Dennehy v. Soto*, 2018 WL 4936003, at *2 (D. Conn. Oct. 11, 2018) (Shea, J.). As they did above, the Plaintiffs preserve this issue for appeal.

The plain text of the Eleventh Amendment only provides a non-consenting state with immunity for suits in diversity jurisdiction. The Eleventh Amendment reads: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Consequently, the Eleventh Amendment provides no bar to the Court's pendent jurisdiction over state law claims.

Should the Court agree with the Plaintiffs' arguments as to the scope of the Eleventh Amendment in the pendent jurisdiction process or if an appeals court does and remands the case, the Court may properly certify what Governor Lamont admits are novel issues of Connecticut constitutional law to the Connecticut Appellate Court or the Connecticut Supreme Court. *See* Lamont – Mot. To Dismiss, pp. 37-39.

## VI. PLAINTIFFS' CLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF FROM GOVERNOR LAMONT'S ORDERS ARE NOT MOOT.

The defendant contends that Lamont's order is moot as Lamont has subsequently altered some of his orders such that "key aspects" of the Orders are no longer operative. Those changes, however, are merely cosmetic: presently, restaurants are allowed to provide some indoor service, and gatherings of people are now limited to

25 people indoors, and 100 people outdoors. The plaintiffs respond by asserting that the issue is not moot. The issue in this case is not whether the Governor possesses the lawful authority to order a specific numeric limit on the number of people who can congregate in public, but whether he has the authority to issue such a mandate regardless of the number, whether the number be two, five, ten or 100.

Additionally, the plaintiffs contend that given the rolling nature of the COVID-19 pandemic, and the fact that as recently as this week, the Governor adjusted reporting restrictions for persons traveling to Connecticut from out of state, the rules in question are moving targets. Accordingly, if this Court finds colorable the defendant's mootness claim, the plaintiffs assert an exception to the mootness doctrine – the issues are capable of repetition yet evading review.  This exception applies in cases where a party can  "make a reasonable showing that he will again be subjected to the alleged illegality." *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983).

The pandemic appears to be under control in Connecticut, but not so in many other states. Connecticut now requires visitors from Connecticut to either test negative for viral infection upon arriving in this state, or to self-  quarantine for 14-days until the risk of transmission of the virus passes. It is foreseeable that cases of the virus will once again spike, and that the state and/or municipalities will respond with measures intended to protect the public health, but, as contended here, taken in blatant disregard of the limits on their lawful authority. A ruling on the scope of this authority is necessary now, not the day after the next ad hoc order, in order to protect the plaintiffs' interest in operating their business and earning a living. There is an enormous public interest in assuring the legality of the practices be settled.

Accordingly, the plaintiffs urge this Court to reject the defendant's mootness claim.

## VII.   THE PLAINTIFFS HAVE ARTICLE III STANDING.

"[T] irreducible constitutional minimum of standing contains three elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). First, the Plaintiff must have suffered an "'injury in fact' – an invasion of a legally protected interest which (a) concrete and particularized… and (b) 'actual or imminent', not 'conjectural' or 'hypothetical'." *Id*. (internal citations omitted). Second, the Plaintiffs must show "a causal connection between the injury and the conduct complained of – the injury has to be fairly… trace[able] to the challenged action of the defendant and not… th[e] result of the independent action of some third party not before the court. *Id*. at 560-61 (internal quotation marks and citation omitted). Third, a favorable decision must be "likely, as opposed to merely speculative" to redress the Plaintiff's injury. *Id*. at 561 (internal quotation marks and citation omitted).

"For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

### A.  Injury in Fact

The Plaintiffs' complaint does not fail the pleading standard. The Plaintiffs have alleged that Governor Lamont's executive orders have completely and effectively deprived them of the opportunity to reopen their business. Compl. ¶¶ 19-22 (describing the effect of Governor Lamont's orders on their industry); *see also* Compl. ¶¶ 58, 61, 68, 73 (incorporating ¶¶ 19-22 into each count against Governor Lamont). This is no

conjectural or hypothetical injury, but one that is concrete and particularized to them as restaurant owners, thus meeting the requirements of *Lujan*.

Governor Lamont also challenges whether the Plaintiffs have standing on the grounds that they voluntarily closed their business. The Plaintiffs' responsible exercise of their liberty in a time of extreme uncertainty does not bar their application for relief from the Governor's orders that he has directed state and local police to enforce by issuing summons for fines and the possibility of incarceration. Moreover, the Plaintiffs would be risking their business license to reopen in the face of Governor Lamont's orders. The Governor's mandatory closure order has stripped the Plaintiffs of their ability to avoid or mitigate their financial losses since its inception. Consequently, Governor Lamont's orders have created an ongoing injury to the Plaintiffs – the proper parameters of which can be determined by their testimony as to when their closure no longer became voluntary.

### B. Causal Connection

The Plaintiffs' financial injuries must be fairly traceable to Governor Lamont's executive orders under *Lujan*. Governor Lamont argues that the Plaintiffs are responsible for their own injuries by voluntarily closing on March 15, 2020. *See* Lamont – Mot. To Dismiss, p. 26. In the alternative, he blames the pandemic. *Id*.

The Plaintiffs chose to close their doors out of an abundance of caution. The Governor's orders strip them of a choice to legally open their doors as they see fit and had planned, which they are clearly challenging before this Court. Even if the Plaintiffs concede that they suffered no harm during a period of voluntary closure (a few days), the Governor's subsequent mandatory closure order rendered all closures involuntary. The

Governor's mandatory closure order stripped the Plaintiffs of their ability to avoid or mitigate their injuries since its inception. Any attempt by the Plaintiffs to "violate" Governor Lamont's order would have resulted in criminal charges, fines, suspension of the Plaintiffs' business license, and the possibility of incarceration. Consequently, any injuries incurred by the Plaintiffs after they had determined that they would no longer remain voluntarily closed are fairly traceable to the Governor's orders.

### C. Redressability

A favorable decision from the Court will undoubtedly, not just likely as required by *Lujan*, redress the Plaintiffs' injuries in several ways. First, it would enable the Plaintiffs to exercise their constitutional rights again without fear of criminal repercussions. Second, it will provide the Plaintiffs with just compensation for Governor Lamont's taking of their property. Third, it will enable the Plaintiffs to mitigate, if they can, the possibility that they may go out of business.

## VIII.  THE LLC PLAINTIFF HAS ARTICLE III STANDING ONLY AS TO COUNT ELEVEN, WHICH GOVERNOR LAMONT DOES NOT CHALLENGE.

The Plaintiffs concede that the constitutional rights that they assert in Counts Eight through Ten are personal rights guaranteed to individuals only, not corporations. To the extent that they have pled those claims on behalf of the LLC Plaintiff, it is a harmless scrivener's error that they acknowledge. However, Governor Lamont does not challenge that the LLC Plaintiff has standing for Count Eleven, and the Plaintiffs reserve their position that Count Eleven was properly pled as it is written.

IX.    **THE PLAINTIFFS' CLAIMS HAVE ENOUGH MERIT TO SURVIVE A MOTION TO DISMISS.**

Governor Lamont relies wholly on *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) and its limited progeny to justify their total suspension of the Plaintiffs' constitutional liberties not just for days, but for almost two months to date. Their reliance is grossly misplaced.

First, *Jacobson* is no North Star of modern constitutional jurisprudence during a public health emergency. The Supreme Court decided *Jacobson* in 1905, long before the modern constitutional frameworks for analyzing the First Amendment and other fundamental rights were established. Indeed, the Supreme Court did not develop the modern "strict scrutiny" test until *half a century after Jacobson* was issued. *See NAACP v. Button*, 371 U.S. 415, 438 (1963) (marking the Supreme Court's first use of the "compelling state interest" test that has become the hallmark of strict scrutiny"). Consequently, any reliance upon *Jacobson* must overcome the significant "challenge of reconciling century-old precedent with… more recent constitutional jurisprudence." *Adams & Boyle, P.C. v. Slatery*, 2020 WL 1982210, at *9 (6th Cir. Apr. 24, 2020).

*Jacobson*'s track record smacks of outrageous instances of tyranny. *Buck v. Bell* – one of the most repudiated decisions in our nation's history – serves as a perfect illustration of this challenge. In *Bell*, the Supreme Court upheld a Virginia law mandating the forced sterilization of the "feeble minded," and, writing for the majority, Justice Holmes relied completely on *Jacobson*: "The principle that sustains compulsory vaccination is broad enough to cover cutting the Fallopian tubes. *Jacobson v. Massachusetts*, 197 U.S. 11. Three generations of imbeciles are enough." *Buck v. Bell*, 274 U.S. 200, 207 (1927). There is no question that Virginia's law in *Buck v. Bell* would receive, and would not

14

survive, strict scrutiny today. The lesson of *Buck v. Bell* is that courts cannot fail to fulfill their constitutional roles by rubber-stamping every government action taken in the name of preserving public health. Consistency mandates a similar approach in the instant action. *Jacobson* does not absolve Governor Lamont from his burden to satisfy strict scrutiny. It merely establishes a rule of reasonableness.

Second, while *Jacobson* establishes the principle that no constitutional right is absolute, it also establishes that there are constraints on the state's police power. *Jacobson*, 197 U.S. at 26 ("But the liberty secured by the Constitution of the United States to every person within its jurisdiction does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint."). Individual liberties, "under the pressure of great dangers," may be *reasonably* restricted "as the safety of the general public may demand." *Id*. at 29. However, *Jacobson* does not provide Governor Lamont with unchecked *carte blanche* to run amuck over constitutional liberties.

The courts still have a constitutional obligation to review measures instituted under the purview of *Jacobson* if they have "no real or substantial relation to those objects, or [are], beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *Id*. at 31. The *Jacobson* Court further defined this standard by stating that the courts have an obligation to review a restriction when it is "arbitrary, and not justified by the necessities of the case." *Id*. at 28. The "necessities of the case" review of the state's police power safeguards individuals when the police power is exercised "in particular circumstances and in reference to particular persons in such an arbitrary, unreasonable manner, or [goes] so far beyond what [is] reasonably required for the safety of the public,

as to authorize or compel the courts to interference for the protection of such persons."
*Id*. at 28.

Governor Lamont's executive orders do not even cross the threshold of reasonableness because they so thoroughly and arbitrarily restrict constitutional rights without any appreciable basis in reason or science. They arbitrarily suspend constitutional rights indefinitely with the threat of jail, fines, and termination of business licensing for non-compliance with the various iterations of his Orders.  The orders arbitrarily determine whether the rights to freely assemble, freely associate with other people, and pursue an honest living are essential. As such, the orders are not narrowly tailored and cannot survive strict scrutiny.

**A. The Plaintiffs' Freedom of Assembly Claims Survive A Motion to Dismiss.**

The U.S. Supreme Court has repeatedly established, and it has long been understood, that the First Amendment guarantees physical gatherings – a right that "cannot be denied without violating those fundamental principles of liberty and justice which lie at the base of all civil and political institutions." *De Jonge v. Oregon*, 299 U.S. 353, 364 (1937) (citations omitted). Indeed, the very nature of a constitutional republic "implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances." *United States v. Cruikshank*, 92 U.S. 542, 552 (1875). This right "is found wherever civilization exists." *Id*. at 551. As Justice Story explained, "[i]t is impossible that [this right] could be practically denied, until the spirit of liberty had wholly disappeared, and the people had become so servile and debased, as to be unfit to exercise any of the privileges of freemen." J. Story, Commentaries on the Constitution of the United States § 1984.

Governor Lamont imposed an executive order on March 26, 2020 that banned all gatherings of people that exceeded five in number. Compl. ¶ 22. He has since changed his Orders in what he describes as "key aspects", but which are in fact merely changes in degree, not substance.  Moreover, by changing the number of people allowed to gather when the disease is no less contagious, the Governor has demonstrated the arbitrary nature of his Orders. By arbitrarily imposing limitations on the number of people who may gather, Governor Lamont has unduly burdened free speech and free association by functionally "eliminating a common means of speaking…" – an action that the Supreme Court has flatly described as suppressing "too much speech." *City of Ladue v. Gilleo*, 512 U.S. 43, 55 (1994). These burdens reach impermissible levels when they functionally eliminate a "venerable means of communication that is both unique and important." *Id*. at 54-55. No means of communication is more venerable and ancient in our nation's tradition than the public meeting: "It is hard to overestimate the historic significance and patriotic influence of the public meetings held in all the towns of Massachusetts before and during the Revolution." *Wheelock v. Lowell*, 196 Mass. 220, 227 (1907). Just as in colonial taverns did, restaurants and bars such as the Plaintiffs' serve an invaluable purpose toward facilitating discussion and allowing their owners to engage in such discussions. By limiting the number of people who can assemble and arbitrarily regulating the Plaintiffs' operation of their business, Governor Lamont has categorically stripped the public of a vital public forum that predates the United States Constitution and are blatantly suppressing speech by restricting public meetings.

Governor Lamont argues that *Jacobson* held that far greater restrictions on the right to assemble were constitutionally justified. *See* Lamont Mot. To Dismiss, p. 16-19.

However, he misreads *Jacobson*'s dicta. The quarantines referenced in *Jacobson* were only applied to individuals who had already been exposed to a contagious disease during the course of an ocean voyage. *Jacobson*, 197 U.S. at 29. These quarantines were narrowly tailored in the sense that they were only applied to people who had been exposed to a contagious disease. Governor Lamont has not imposed a limited quarantine on individuals who have either contracted coronavirus or have been exposed to someone who contracted coronavirus. He has functionally quarantined the entire healthy, non-exposed population of Connecticut and suspended their constitutional rights indefinitely. His actions in doing so are unconstitutionally arbitrary and "a plain, palpable invasion of rights secured by the Constitution." *Id.* at 28, 31.

Governor Lamont's arguments also ignore the well-established principle for a motion to dismiss, which requires the Court to "draw all reasonable inferences in a plaintiff's favor." *Moore v. Connecticut Dept. of Correction*, 2015 WL 778626, at *2 (D. Conn. 2015) (citing *Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chicago v. Bank of New York Mellon*, 775 F.3d 154, 159 (2d Cir. 2014)). He argues that the Plaintiffs have not stated any allegations as to when and where they want to assemble, with whom, and for what purpose. *See* Lamont – Mot. To Dismiss, p. 19-23. The Governor's arguments fail for two reasons. First, the Plaintiffs have alleged that Governor Lamont has banned any physical assembly for any purpose that exceeds a certain number of people, which certainly covers any assembly that they wish to hold. Compl. ¶ 22. Second, it does not take any stretch of the imagination to infer from the Plaintiffs' complaint that they want to assemble with others at their place of business for social

purposes including, but not limited to the discussion of current events – a purpose that predates the federal constitution.

Furthermore, the cases upon which Governor Lamont relies are inapplicable. *Johnson v. Perry*, 859 F.3d 156 (2d Cir. 2017) did not address a pleading standard and reviewed a motion for summary judgment concerning the right to protest on government property. *Cox v. State of Louisiana*, 379 U.S. 536 (1965) did not even concern a civil case, reviewing the criminal convictions of civil rights demonstrators who picketed a state courthouse. Finally, the court in *A.B.C. Home Furnishings, Inc. v. Town of East Hampton*, 947 F. Supp. 635 (E.D.N.Y. Dec. 14, 1996) found that the town's revocation of a permit for an event in a zoned residential neighborhood was based on its determination that the event was commercial in nature rather than a charity event. The court, in no way, required a heightened standard of pleading for First Amendment assembly claims. Moreover, the instant case differs in the critical aspect that Governor Lamont directly prohibited all assemblies with his order whereas the town simply terminated a permit for a charity event.

Governor Lamont also presented an elitist argument that virtual assemblies are adequate alternatives to public meetings and gatherings. His claim that "virtual assemblies' on the Internet are adequate alternatives to public meetings and gatherings falls flat for two reasons. First, the right to assemble is a separate and distinct right "cognate to those of free speech and free and… equally fundamental." *De Jonge*, 299 U.S. at 364. Sending a letter, posting a comment online, or making some other form of online communication (assuming that one can afford access to the Internet) are merely alternative forms of expression, but they do not serve as alternative forms of *assembly*. They are not assembly at all.

Second, Internet-age forms of expression are not available to all of Connecticut's residents. The poor often do not have adequate access to new technologies, and they must trust in the power of their voices and their assembled numbers to have even the smallest hope of being heard. *See Gilleo*, 512 U.S. at 57. The limited opening of public libraries and the limitations on the number of people who may gather there has only exacerbated this problem. Governor Lamont may not condition the right to assemble and freely associate with others on the means to purchase a computer, webcam, and internet service. Furthermore, because Internet service providers and platforms are private companies, who repeatedly demonstrate themselves to be more than willing to censor content and silence disfavored points of view including by coordinating with local governments[8], they do not offer adequate alternatives as far as the right to freely assemble is concerned.[9]

In other words, Governor Lamont's "alternative" is one that only the privileged in society can enjoy and one where speech is grossly inhibited. The First Amendment right to freedom of assembly does not depend on financial means or the government's benevolence in providing a means to access the internet. The First Amendment right to freedom of assembly guarantees freedom of assembly to everyone, and the Plaintiffs, just like the tavern owners of the Founding era, serve a vital role in facilitating this right.

---

[8] Donie O'Sullivan & Brian Fung, CNN, *Facebook will take down some, but not all, posts promoting anti-stay-at-home protests*. April 20, 2020, https://www.cnn.com/2020/04/20/politics/facebook-covid-shutdown-protests/index.html

[9] It is telling that a video in which medical doctors critiqued the wisdom of lock-down orders like EO 28 was recently removed from the Google-owned YouTube platform for violating its "community guidelines." Veronica Morley, 23ABC NEWS, *YouTube Issues Statement on Removal of Controversial Video Interview with Bakersfield Doctors*, April 27, 2020, https://bit.ly/2W12kLr .

Governor Lamont's orders are also arbitrary in the sense that they allow some gatherings of individuals for essential purposes only (i.e. grocery shopping) provided that they observe proper social distancing practices. Governor Lamont has given no consideration to mandating the same social distancing rules for other assemblies such as conversation. He does not count the two hundred or more people in a grocery store at any given time. Nor does he require large retailers to actively monitor their patrons' activities and distance from each other. Instead, Governor Lamont has prescribed recommendations to these retailers that enable them to operate and people to assemble within their establishments. Governor Lamont has not prescribed, nor has he made any effort to prescribe, reasonable regulations to allow the Plaintiffs to operate and to assemble with likeminded individuals in their establishments or in their homes. In other words, Governor Lamont arbitrarily place his trust in some individuals to responsibly exercise their liberties, but not in others.

There is no meaningful distinction between a person sneezing, coughing, or executing a natural bodily function in a grocery store or any other establishment that Governor Lamont has allowed to remain open on an unrestricted basis and a restaurant or any other establishment that Governor Lamont has ordered to remain closed or only open under proscribed, arbitrary conditions. Unless the laws of nature have ceased to exist in Governor Lamont's favored locations, coronavirus is more likely to spread through gatherings at a grocery store or any other establishment that Governor Lamont allowed to remain open on an unrestricted basis because they host far larger and more frequent gatherings of individuals. Furthermore, with Governor Lamont providing *carte blanche* exception to their face mask policies, Governor Lamont's only remaining effective policies

for safety at gatherings are social distancing. Governor Lamont's extreme, arbitrary regulation of establishments such as the Plaintiffs' is entirely based on his personal assessments on what businesses are necessary to a society, not whether the Plaintiffs' establishment can be operated safely. Consequently, it is entirely arbitrary and unreasonable.

Finally, the Plaintiffs are more than capable and willing to develop their own policies to maintain social distancing at their restaurant and even to work with Governor Lamont to do so. Governor Lamont prefers to hire out of state consultants for millions of dollars and has displayed a complete lack of interest or willingness to work with the Plaintiffs and similarly situated business owners that he disfavors. Nonetheless, Governor Lamont is more than willing to work with large establishments that he favors to ensure that those establishments can host gatherings of people accordance to social distancing guidelines. Governor Lamont's outright failure to do so with the Plaintiffs is an arbitrary and unreasonable choice that furthers an arbitrary and unreasonable policy that prevents the Plaintiffs from operating.

Consequently, the Court should deny Governor Lamont's motion to dismiss Count Eight.

### B. The Plaintiffs' Freedom of Association Claims Survive A Motion to Dismiss.

The Supreme Court established a right to freedom of association in *Roberts v. U.S. Jaycees*, 468 U.S. 609 (1984) that covers associations formed for the purposes of "engaging in those activities protected by First Amendment – speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts*, 468 U.S. at 618. The *Roberts* Court characterized this right as "an indispensable means of preserving other

individual liberties." *Id.* Under the right to freedom of expressive association, the Supreme Court has long recognized that it covers broad categories: "we have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Id.* at 622 (compiling cases).

The Supreme Court characterized government actions that seek to impose penalties on individuals because of their association with a disfavored group as unconstitutional. *Id.* There is no question that such a situation exists here. The Plaintiffs risk criminal repercussions including fines and incarceration if they attempt to associate with more than the Governor's chosen number of people at any given time. If they attempt to do so at their place of business, Governor Lamont will not think twice about revoking their business license.

Governor Lamont relies primarily on a district court's compilation of cases for his argument that non-familial relationships are not generally entitled to First Amendment protection despite its clear contradiction of the Supreme Court's established precedent in *Roberts*: *Maselli v. Tuckahoe Union Free School Dist.*, 2019 WL 3456581 (S.D.N.Y. July 31, 2019). As an initial matter, *Maselli* is entirely inapplicable to the instant case because it involved a claim of intimate association, not expressive association of the kind described in *Roberts*. *Maselli*, 2019 WL 32456581, at *4. Most of the cases that *Maselli* compiles do not address the right to expressive association, only to intimate association. Consequently, *Maselli* cannot support its own sweeping language, and the one case that may supports its position is *Sanitation and Recycling Indus. v. City of New York*, 107 F.3d 985 (2d. Cir. 1997).

While *Sanitation and Recycling* cites *Roberts* for the proposition that the First Amendment does not protect business relationships, it misreads *Roberts.* The portion of *Roberts* that *Sanitation and Recycling* relies on is its rejection of a large business enterprise with remote connections as being an example of an intimate association. *Roberts*, 468 U.S. at 620. *Sanitation and Recycling* does not consider *Roberts*'s holding in its discussion of expressive association: "we have long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Id*. at 622. Consequently, the First Amendment does extend the protection of its expressive association guarantees to economic and social ends.

Just as in colonial taverns did, restaurants and bars such as the Plaintiffs' serve an invaluable purpose toward facilitating discussion and allowing their owners to engage in such discussions. By limiting the number of people who can assemble and prohibiting the Plaintiffs from operating their business as they see fit, Governor Lamont has categorically stripped the public of a vital public forum that predates the United States Constitution and are blatantly suppressing speech by restricting public meetings and associations.

Finally, as discussed previously, Governor Lamont's reliance on *Jacobson* is misplaced because *Jacobson* has not been reconciled with modern constitutional jurisprudence.

Consequently, the Court should deny Governor Lamont's motion to dismiss Count Eleven.

**C. The Plaintiffs' Right To Pursue an Honest Living Claims Survive A Motion to Dismiss.**

The Plaintiffs contend that the U.S. Supreme Court has recognized the fundamental unenumerated right to pursue an honest living in *Dent v. West Virginia*: "[i]t is undoubtedly the right of every citizen of the United States to follow any lawful calling, business, or profession he may choose, subject only to such restrictions as are imposed upon all persons of like age, sex, and condition." 129 U.S. 114, 121-22 (1889). As such, the Plaintiffs are entitled to strict scrutiny on any regulation that infringes upon this right.

Governor Lamont contends that the Supreme Court recognized no such right. *See* Lamont – Mot. To Dismiss, p. 23-28. However, even assuming the truth of Governor Lamont's contention, the Court still has an obligation to conduct an analysis under *Glucksberg* or *Obergefell* to determine whether the Due Process Clause of the Fourteenth Amendment protects the right to earn an honest living.[10]

Under *Obergefell*, a fundamental unenumerated right may be recognized and afforded strict scrutiny when the courts exercise reasoned judgement to identify "interests of the person so fundamental that the State must accord them its respect." *Obergefell v. Hodges*, 135 S.Ct. 2584, 2598 (2015). While "[h]istory and tradition guide and discipline this inquiry…," it "does not its outer boundaries." *Id*.

To receive strict scrutiny under *Glucksberg*, a fundamental unenumerated right must be "objectively, 'deeply rooted in this Nation's history and tradition'" and "'implicit in

---

[10] The Supreme Court's methodology for recognizing fundamental unenumerated rights is disputed. *See* Stephen G. Gilles, *Why the Right to Elective Abortion Fails Casey's Own Interest-Balancing Methodology – And Why It Matters*, 91 Notre Dame L. Rev. 691, 693 n.11 (2015) (discussing the differences between the *Obergefell* and *Glucksberg* methodologies and questioning whether *Obergefell* overruled *Glucksberg*).

the concept of ordered liberty,' such that neither liberty nor justice would exist if they were sacrificed.'" *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997).

The Plaintiffs satisfy both methodologies. The right to pursue an honest living predates the Magna Carta as the Magna Carta itself recognizes: "[a]ll merchants are to be safe and secure in leaving and entering England, and in staying and traveling [sic] in England… to buy and sell free from all maletotes by the ancient and rightful customs…." J.C. Holt, *Magna Carta* 461-63 (2d ed. 1992).[11] So deeply did this right become established in English common law that the King's Bench in 1602 declared

> [T]his condition is against law, to prohibit or restrain any to use a lawful trade at any time… for as well as he may restrain him for one time… he may restrain him for longer times… being freemen, it is free for them to exercise their trade in any place… [A party] ought not to be abridged of his trade and living.

*Colgate v. Bacheler*, 78 Eng. Rep. 1097 (K.B. 1602).

Lord Coke stated the reasoning for these absolute statements of the English common law right to pursue an honest living in his seminal work on monopolies[12]: "a man's trade is accounted his life, because it maintaineth his life…." Edward Coke, The Third Part of the Institutes of the Laws of England, at *181 (William S. Hein Co. 1986) (1797).

---

[11] The English tradition of individual rights further developed after the Magna Carta through the common law as King Edward I acknowledged in the Confirmatio Cartarum. Confirmatio Cartarum (Nov. 5, 1297).

[12] The monopolies that Lord Coke and William Blackstone confronted were conceptually different from our modern conception of monopolies. Blackstone defined a monopoly as "a license or privilege allowed by the king for the sole buying and selling, making, working, or using of any thing whatsoever; whereby the subject in general is restrain from that liberty of manufacturing or trading which he had before." 4 William Blackstone, Commentaries, at *159.

The Founding Fathers carried their ancestors' antipathy to the Constitutional Convention – a sentiment best summed up by George Mason's declaration that "[h]e was afraid of monopolies of every sort…." James Madison, *Notes of Debates in the Federal Convention* 638 (Adrienne Koch ed., 1966). In that spirit, the Founding Fathers took care not to give the federal government the power to prevent citizens from pursuing an honest living.

In the seminal case of *Corfield v. Coryell*, Justice Bushrod Washington described certain "privileges and immunities which are, in their nature, fundamental, which belong, of right, to the citizens of all free governments…." 6 F. Cas. 546 (C.C.E.D. PA. 1823). These rights included "the enjoyment of life and liberty… the right to acquire and possess property… and to pursue and obtain happiness and safety; subject nevertheless to such restraints as the government may justly prescribe for the general good of the whole…." *Id*.

Picking up on *Coryell*, numerous state courts recognized and referenced the right to earn an honest living. *See, e.g., Sewall v. Jones*, 26 Mass. (9 Pick.) 412 (Mass. 1830); *City of Memphis v. Winfield*, 27 Tenn. (8 Hum.) 707 (Tenn. 1848). This recognition of the historical right to earn an honest living obtained full recognition from the United States Supreme Court in *Dent v. West Viriginia*: "[i]t is undoubtedly the right of every citizen of the United States to follow any lawful calling, business, or profession he may choose, subject only to such restrictions as are imposed upon all persons of like age, sex, and condition." 129 U.S. 114, 121-22 (1889).

There is no question as to the fundamental importance of the right to pursue an honest living in our society. Human survival depends on it as an initial matter. Second,

the right to pursue an honest living is, at its core, an enabling right in society. The ability to earn a living enables individuals to exercise their other constitutional rights (i.e., obtain arms, reach a larger portion of the public through free speech). Without the right to earn an honest living, a person is effectively denied the right to exercise his other rights because he has no economic means to do so.

Consequently, the right to earn an honest living is deeply rooted in this nation's history and tradition and is so fundamental in this nation's scheme of ordered liberty that it must be accorded substantial respect by the state. That substantial respect is strict scrutiny.

While *Dent* recognized that states reserve a police power in the face of this right, it defined the police power of the state over the right to earn a living as authorizing it "to prescribe all such regulations as in its judgment will secure or tend to secure them against the consequences of ignorance and incapacity, as well as of deception and fraud." *Id*. at 122. Nowhere in English or American case law does the state's police power enable it to totally suspend the constitutional right to pursue a living in the name of a public health emergency. *Dent* instead makes it crystal clear that the state's police power is only properly exercised when it protects the public from ignorance, incapacity, deception, and fraud in the carrying out of an occupation.

In conclusion, the Plaintiffs again recognize that the Supreme Court has rejected the Privileges Or Immunities Clause of the Fourteenth Amendment as a textual basis for unenumerated rights. *See The Slaughter-House Cases*, 83 U.S. 36 (1872). However, the Plaintiffs maintain that there is a textual and historical basis for the Privileges or Immunities Clause of the Fourteenth Amendment as the basis for unenumerated rights.

See McDonald v. City of Chicago, Ill., 561 U.S. 742 (Thomas, J., concurring) (discussing at length the history and text of the Fourteenth Amendment's Privileges Or Immunities Clause). They thus preserve the argument for appeal although they recognize that the Court is bound to follow the well-established precedent.

The well-established precedent points toward the recognition of a fundamental, unenumerated right to pursue an honest living. Therefore, the Court should deny Governor Lamont's motion to dismiss Count Ten of the Plaintiffs' complaint.

### D. The Plaintiffs' Takings Claims Survive A Motion to Dismiss.

In his haste to have the Court speedily eject the Plaintiffs from the courthouse, Governor Lamont has made erroneous assumptions both about the Plaintiffs' complaint and the state of the Takings Clause doctrine. He has only challenged the Plaintiffs' argument that his orders create a per se taking in violation of the Fifth Amendment as described by Lucas v. South Carolina Coastal Council, 505 U.S. 1003 (1992). In doing so, he has neglected the alternative circumstantial approach to establishing a regulatory taking employed by Penn Central Transp. Co. v. New York City, 438 U.S. 104 (1978).

The most important modern Takings Clause case is Penn Central. Under the Penn Central test, a regulatory taking may be found without a regulation depriving an owner of all economically beneficial use. Murr v. Wisconsin, 137 S.Ct. 1933, 1943 (2017) (internal citations omitted). The Penn Central test involves a complex set of factors including "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment backed expectations; and (3) the character of the government action." Id. (internal citations omitted).

29

It is no stretch on the reasonable inference powers of this Court to determine that Governor Lamont's orders have placed a tremendously detrimental economic impact on the Plaintiffs. Nor is it any stretch for the Court to infer from the Plaintiffs' complaint that they have invested substantial resources into the property at issue. Compl. ¶¶ 10-12. Furthermore, Governor's Lamont's position has consistently been that his executive orders were issued in the public interest and that they are not ordinary orders, but emergency orders. As such, they have essentially commandeered the Plaintiffs' property to render it inoperable in the public interest. There is no question that, considered in its totality, the Plaintiffs have made out a prima facie case of a regulatory taking under the *Penn Central* test.

The *Lucas* case establishes a categorical rule for regulatory takings that requires the denial of "all economically beneficial or productive use" of the property at stake. *Id.* at 1942-43 (internal citations omitted). In *Lucas*, the Supreme Court further clarified this rule to mean all "economically viable use" of property. *Lucas*, 505 U.S. at 1016. It is not economically viable for the Plaintiffs to operate their business in the manner that Governor Lamont suggests because they would operate at a substantial loss. Consequently, they have been deprived of all economically viable use of their property.

Governor Lamont's reliance on *United States v. Caltex* is misplaced as well. First, *Caltex* did not concern a regulatory taking, but rather the physical destruction of property. Caltex, 344 U.S. 149, 152 (1952). Second, the property owners conceded that the United States Army had never seized the property, but merely destroyed it when it retreated from the Philippines. *Id*. As such, *Caltex* is readily distinguishable because the property owners

conceded that there was no taking. Furthermore, *Caltex* and its predecessors have only been applied in war time under fortunes of war reasoning. *Id.* at 153-55.

Finally, *Caltex* itself cannot survive the text of the Fifth Amendment as Justices Douglas and Black pointed out in their dissent. When the public interest demands that a property be destroyed for a reason other than being a public nuisance, it is appropriated for the common good. *Id.* at 156 (Douglas, J., dissenting). As such, "the public purse rather than the individual [should] bear the loss." *Id.* Governor Lamont has consistently stated that he is acting in the public's interest. Consequently, his executive orders have functionally appropriated property for the common good by rendering them inoperable, and the burden of that appropriation should fall on the public purse, not the Plaintiffs'.

Consequently, the Court should deny the Defendants' motion to dismiss Count Eleven of their complaint.


## X.   GOVERNOR LAMONT ENJOYS NO IMMUNITY FROM THE PLAINTIFF'S CLAIMS.

In a last-ditch effort to escape liability, Governor Lamont asserts two types of immunity: legislative immunity and qualified immunity. Legislative immunity is not applicable in the present case. Qualified immunity has no textual basis in the Constitution, and, if it does, Governor Lamont's actions are so blatantly unconstitutional that any reasonable person would have known that they were.

### A. Governor Lamont Does Not Enjoy Absolute Legislative Immunity.

Governor Lamont asks this Court to go where no governor has ever gone before and declare that his actions under the color of Conn. Gen. Stat. § 28-9 constitute the enactment of legislation. Lamont – Mot. To Dismiss, p. 34. Notably, Governor Lamont

cannot cite a single Connecticut court case that holds that he has the power to legislate, but he asks this Court – a federal one – to give him that power while vigorously protesting in the same memorandum that the Court should not decide state constitutional questions. Furthermore, Governor Lamont cannot cite a single federal case that has declared an executive order to be a legislative act.

Governor Lamont's executive orders are not legislative in form because they are not integral steps in the legislative process. *State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 89 (2d Cir. 2007) (denying legislative immunity to the governor at the motion to dismiss stage because his termination of three thousand employees was not clearly part of his budget plan in that litigation stage). Governor Lamont also relies on *NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177, 190 (2d Cir. 2019) to support his position. Unlike the present case, *NRP Holdings* concerned a mayor's corrupt failure to forward necessary resolutions to the city council for approval, thus initiating the legislative process. *NRP Holdings*, 916 F.3d at 188. Governor Lamont in the present case requires no prior approval from the legislature to declare a public emergency or to suspend certain statutes although the legislature may disprove his decisions if it so chooses. Conn. Gen. Stat. § 28-9(a); Conn. Gen. Stat. § 19a-131a(b)(1). He is not initiating legislative action in other words.

Consequently, Governor Lamont is acting purely in an executory capacity under Article the Fourth, § 12 of the Connecticut Constitution. As part of his executive authority, the state legislature has authorized him to suspend the execution of certain laws according to the procedures that it has set out. It certainly did not authorize him to legislate

new laws like he claims. As such, Governor Lamont is not entitled to absolute legislative immunity.

Even assuming arguendo that Governor Lamont's actions are integral steps in the legislative process, his claim for legislative immunity still fails because his executive orders do not bear the hallmarks of traditional legislation. *Rowland*, 494 F.3d at 89. All of the cases that Governor Lamont relies on involve the natural conclusion of a legislative process, not a purely executive function. In *Baraka v. McGreevey*, 481 F.3d 187 (3d Cir. 2007), the Second Circuit held that a governor was not liable for advocating for a bill and then signing it with the express intent of abolishing a position held by a government poet who had written some poetry that the governor considered to be racist. Unlike the instant case, the *Baraka* governor engaged in the legislative process. Governor Lamont has only engaged in the executive process.

The other case that Governor Lamont relies on contains almost identical facts. In *Bogan v. Scott-Harris*, the Supreme Court afforded legislative immunity to a mayor who submitted his budget proposal and proposed eliminating a number of city positions including that of an employee who had been politically targeted for racist remarks. 523 U.S. 44 (1998). Again, the *Bogan* mayor engaged in the legislative process by submitting a budget to the city council. Governor Lamont has acted purely in an executive capacity by refraining from executing certain laws as he is authorized to do by legislation and exceeding his statutory authority by suspending the Constitution. Consequently, Governor Lamont does not enjoy legislative immunity because he is acting in purely an executive capacity instead of a legislative capacity.

Finally, Governor Lamont cites a litany of cases for the proposition that he enjoys absolute legislative immunity for certain acts. Then he proceeds to confess that he exceeded the grant of authority given to him by the legislature under Conn. Gen. Stat. § 28-9(b)(1). The legislature did not authorize Governor Lamont to suspend the entire state of Connecticut's constitutional liberties nor could it because of the Supremacy Clause. Instead, the legislature only authorized Governor Lamont to modify or suspend Connecticut statutes, regulations, or requirements in part or in whole to protect public health. Consequently, by suspending constitutional rights for the entire state of Connecticut, Governor Lamont has exceeded the scope of the permissible authority granted to him by Conn. Gen. Stat. § 28-9(b)(1), thus stepping outside the valid quasi-legislative process and forfeiting his absolute immunity.

### B. Governor Lamont Does Not Enjoy Qualified Immunity.

Qualified immunity is a modern innovation and has no true ancestor in the common law nor any textual basis in the federal constitution or 42 U.S.C. § 1983. At best, it is the substitution of judicial policy preferences for congressional mandates. Consequently, the Plaintiffs dispute its application in this case, but they recognize that the Court will adhere to the tremendous body of qualified immunity precedent and reserve the issue for appeal.

The ostensible purpose of qualified immunity is to provide officials with notice of the legal constraints and consequences on their conduct. *Moore v. Andreno*, 505 F.3d 203, 214 (2d Cir. 2007). Plaintiffs who encounter a qualified immunity defense at the motion to dismiss stage are entitled to "all reasonable inferences from the facts alleged, not only those that support [their] claims, but also those that defeat the immunity defense." *McKenna v. Wright*, 386 F.3d 432, 434 (2d Cir. 2004). The appropriate inquiry is then to

34

ask whether the plaintiff has pled "facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ganek v. Leibowitz*, 874 F.3d 72, 80 (2d Cir. 2017) (internal quotation marks omitted).

In the instant case, the Plaintiffs have alleged that Governor Lamont did not merely violate their constitutional rights in some unclear fashion. The Plaintiffs have alleged that he has completely suspended their constitutional rights indefinitely. The constitutional rights that they have alleged that Governor Lamont has violated have been established for well over seventy years. There is no quarantine case law or other public health case law that gives Governor Lamont the authorization to completely suspend constitutional rights in the name of a public health emergency. Rather, the relevant case law as discussed above requires him to institute narrowly tailored measures to protect the public. Governor Lamont deliberately ignored the federal constitution and chose to implement sweeping orders with no regard for clearly established constitutional principles. Consequently, he is not entitled to qualified immunity at this stage.

## XI.   If The Court Rejects The Federal Claims, It Should Decline To Exercise Its Supplemental Jurisdiction Over The State Claims; In The Alternative, The Court Should Retain The State Claims Insofar As They Seek Equitable Relief

In the event the Court dismisses the federal claims, the plaintiffs request that this Court decline supplemental jurisdiction of the State Constitutional claims on grounds of judicial economy and comity. The Constitutional questions the plaintiff seeks to raise on the State level may include issues of first impression that would be better litigated in the State forum. It is foreseeable that matters from this Court might be certified to the State Supreme Court for decision. The plaintiffs, having sought emergency relief in the

exigent circumstances of the ongoing pandemic, would be better served, as would the public at large, by resolution of the State constitutional claims in the State courts.

In the alternative, the cases the defendant recites as to a private right action pertain only to claims for money damages. The plaintiff reserves the right to seek equitable relief, including declaratory and injunctive relief. For that reason alone, the defendant's motion to dismiss should be denied.

## CONCLUSION

For the foregoing reasons, the Plaintiffs respectfully request the Court to deny Governor Lamont's motion to dismiss in its entirety.

THE PLAINTIFFS

By /s/ Kevin M. Smith /s/
          KEVIN SMITH
          Pattis & Smith, LLC
          383 Orange Street
          New Haven, CT 06511
          203.393.3017
          203.393.9745 (fax)
          Juris No. 427828
          Ksmith@Pattisandsmith.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 29, 2020, I filed a copy of the foregoing electronically and served a copy of the foregoing by mail on anyone unable to accept electronic filing. The Court's electronic filing system will send notice of this filing by e-mail to all parties. Parties may access this filing through the Court's CM/ECF System.

/s/ Kevin M. Smith /s/

37